ROBERT N. KEELY et al.

*v.*

HENRY M. BLACK et al.

[Submitted June 10th, 1919. Decided July 10th, 1919.]

1. A secret profit realized by a president of a company from an undertaking to deliver the corporate control of the company, enures to the corporation.

2. Where the president of a company clandestinely dealt with corporate assets for his private gain, he is culpable, and not personally entitled to the profits of the transaction; and it makes no difference whether or not the transaction was independently profitable to the company. A trustee is liable for secret profits even though the transaction from which they arose benefited the trust.

On bill, &c.

*Mr. Martin V. Bergen* and *Mr. Thomas P. Curley,* for the complainants.

*Mr. Harold B. Wells,* for the defendant Henry M. Black.

*Messrs. Collins & Corbin* (*Mr. Gilbert Collins* of counsel), for the defendant Farmers Telephone Company.

*Mr. Carl M. Abromeit,* for the defendant the New York Telephone Company.

BACKES, V. C.

This suit is brought by stockholders of the Farmers Telephone Company to recover for the company, from Henry M. Black, its president, secret profits made by him in securing the transfer of certain property rights of the company, and the control of the company, to the New York Telephone Company

and the Delaware and Atlantic Telegraph and Telephone Company, known as the "Bell Companies," in breach of his trust.

The facts are not in dispute. The Farmers Telephone Company is capitalized at $100,000, divided into two thousand, shares of the par value of $50, and was a dividend paying corporation. Black owned upwards of five hundred shares, and controlled others belonging to members of his family; the remaining shares were held by farmers and merchants of the vicinity in which the company operated. He was the largest individual stockholder, and had been president of the company for many years. The company's telephone system covered an area of approximately four hundred and fifty square miles, connecting communities in Burlington, Monmouth and Ocean counties, locally and with "long distance," and it had the exclusive right, by contract with the Bell companies, of furnishing telephonic communication within this district. In June, 1917, just after we entered · the war with Germany, Wrightstown, within the district, was selected by the federal government as a cantonment—Camp Dix—and the Farmers company installed telephonic service, and engaged with the military official in charge of the camp to provide for future needs and to that end arranged with a leading supply company to furnish the equipment. Shortly afterwards the Farmers company was notified by the supply company that the Bell companies would install the system at Camp Dix, and that the equipment would be furnished to those companies. Without notice or apology the 'phones of the Farmers company were disconnected and 'phones of the Bell companies took their place. And this is the explanation: Black secretly agreed with the Bell companies to release them from their exclusive grant to the Farmers company of the territorial' rights to Camp Dix, and to deliver to them at least fifty-five per cent. of the capital stock of the Farmers company on or before August 1st, then next, in consideration that the Bell companies would purchase his holdings and additional shares up to fifty-five per cent. at par. The Bell companies further agreed to pay Black $45,000 if he procured to be delivered to them within one year all the shares at par, or $15 per share if over eighty per cent., or $10 per share if over seventy-five per cent., or $5

per share if over fifty-five per cent. be delivered. The arrangement was at first verbal. Black employed crude, but by no means original, methods to accomplish his purpose. He browbeat the twelve directors of the Farmers company into handing over their shares by the threat that he would so manipulate the company that it would never again pay a dividend, and they believed him: and then he salved them with a promise of $5 per share above par if they would accede, of which, they have not, as yet, seen the color. He sent his emissaries with the same bug-a-boo to the remaining stockholders, with the result that he gathered in all the stock except eighty shares held by the complainant Dr. Keely, who refused to be intimidated. When Black secured the holdings of the directors, some four or five hundred shares, he caused to be reissued to each of them a single share to colorably qualify them as a board, but he was careful to exact an assignment in blank of the certificates. He then, under date of June 29th, signed, as president, an agreement between the Farmers company and the Bell companies releasing the exclusive rights to Camp Dix, and, under date of July 2d, he executed another personally (it is fair to assume they were executed simultaneously), wherein he and the Bell company reduced to writing their verbal arrangement that Black was to obtain the release and deliver to the Bell companies the control of the Farmers company. The agreement recites that it is entered into by the Bell companies, relying solely upon the truth of representations made by Black as to the Farmers company's legal status, and its physical and financial condition therein enumerated in detail, and that Black was the holder of at least fifty-five per cent. of the capital stock, and that he was in position to acquire more and was willing to sell it to the Bell companies. By the "first" section Black agrees to sell and the Bell companies agree to purchase on or before August 1st, 1917, fifty-five per cent., or one thousand one hundred shares, for $55,000,

"provided and upon condition (a) that the Farmers Telephone Company shall have duly released, in writing, so much of the territory sub-licensed to it by the respective Bell companies under the sub-license agreement or agreements now in force between the Farmers Telephone Company and the Bell companies, as is within the proposed United States army cantonment, and its environs, contemplated to be estab-

lished or which may hereafter be established, at or near Wrightstown, New Jersey, and that said Farmers Telephone Company shall have formally consented, in writing, to the furnishing by the Bell companies, or either or both of them, of telephonic service within the territory so released, and has released and discharged the Bell companies severally from any further obligations under or by virtue of said sub-license agreement or agreements with respect to the territory so released except so far as said territory thereby shall become a part of the territory operated by the Bell companies, and said Farmers. Telephone Company shall have agreed in writing to the use by the Bell companies, or either or both of them, of the poles, lines, plant and equipment of the Farmers Telephone Company within the territory so released, at the usual rental or attachment charges therefor ;"

and (*b*) that the authorization of the board of public utility commissioners to the transfer be obtained. By the "second" section the Bell companies agree, provided the one thousand one hundred shares have been delivered and transferred according to the terms set forth in the "first" section and "the provisos of said section have been fully met and complied with," to purchase the remaining shares within one year at $50 per share, if procurable. In the "third" section Black covenants, warrants and guarantees the representations made in the recital of the contract, and further that "(I) During any time or period affected by this agreement no dividend shall be declared or paid, nor any distribution of capital or surplus made or attempted to be made by the Farmers Telephone Company." By the "fourth" section the Bell companies agree to pay Black $45,000 if he shall have within one year delivered all the stock at $50 per share, "and all the provisions and conditions of this agreement shall have been carried out and complied with," or $15 a share if more than eighty per cent., or $10 per share if more than seventy-five per cent., or $5 per share if more than fifty-five per cent., of the stock shall have been delivered and transferred. At the time Black executed these agreements he had, of course, everything fixed for the ratification of the release by the Farmers Telephone Company. The directors were then mere "dummies" to whom he presented it on July 11th, and they, without any fore-knowledge of it, or of the part it played in the stock-sales agreement, of which they knew nothing, although they suspected Black was profiting heavily, perfunctorily confirmed

it. The $45,000 goal was blocked by Dr. Keely's unyielding attitude, but the scaled-down bonus, amounting to $28,635, was paid to Black when he delivered up one thousand nine hundred and nine shares.

We need look no further than the written agreements for proofs plenary that the bonus was paid in part for the release and in part for the control of the company. The main thing the Bell companies sought, bargained for and got through Black's conduct was the surrender by the Farmers company of its exclusive right in the camp, for which they paid him instead of the company, but, nevertheless, in conscience, to the use of the company, $28,635. The contract of July 2d leaves no doubt of this. In the "fourth" section it is repeated that the moneys were to be paid only in the event that, among other things, "all the provisions and conditions of this agreement shall have been carried out and complied with," and the most prominent of these is the provision relating to the release. The other consideration for the bonus was the control of the company. A secret profit realized by a director from an undertaking to deliver the corporate control of his company, enures to the corporation. *4 Fletch. Cyc. lit. "Corporations"* § *2321; 2 Thomp. Corp.* § *1237; McClure* v. *Law, 161 N. Y. 78; Heineman* v. *Marshall, 117 Mo. App. 546; Porter* v. *Healy, 244 Pa. 427.* In either aspects of the case Black is culpable. Complainants' counsel characterize the transaction as bribery of the president to sell out the company, and they may be right, but it is not necessary to resort to such harsh denunciation in order to call him to account. It is enough that it appears, as it does, unmistakably, that Black, while president of the company, and in fiduciary relation to it and the body of stockholders, clandestinely dealt with corporate assets for his private gain. The established policy of the law is that a trustee shall not make a penny-piece of personal profit out of his trust, and the rule, based upon this salutary policy, is inexorable, and the courts tolerate not the least encroachment, whatever the circumstances may be. The duty of a fiduciary first and all the time is to his trust. It is not only foremost, but his self-interest must be entirely eliminated. It would be a difficult task to find in the

books a principle more uniformly upheld and rigorously enforced than the one that a trustee shall not enrich himself by the use of his trust. The authorities are collected in *2 Thomp. Corp.* § *1233 et seq.; 4 Fletch. Cyc. tit. "Corporations"* § *2303 et seq.; Kelsey v. New England Street Railway Co., 62 N. J. Eq. 742; Barry v. M[o]eller, 68 N. J. Eq. 483; Goodbody v. Delaney, 82 N. J. Eq. 140; Comm. T. I. & Tr. Co. v. Seltzer, 237 Pa. 410.*

It is claimed, and not denied, that the terms of the contract of June 28th, whereby Camp Dix was released, were highly advantageous to the Farmers Telephone Company, and it is therefore urged on behalf of Black that he is not liable for the profits because, forsooth, they were not made at the expense of the company. This begs the question. It may be assumed that the bargain was beneficial to the Farmers company. The testimony is to that effect. It would have cost the company $50,000 to install the telephone system at the cantonment, and it was questionable whether the revenues would have justified the outlay; and it was also an open question whether the traffic arrangement under the contract would not be the more profitable of the two schemes. But whether the contract was or was not advantageous to the Farmers company is a matter entirely irrelevant to the question of Black's accountability. A trustee is liable for secret profits, even though the transaction from which they arose benefited his trust. *4 Fletch. Cyc. tit. "Corporations"* § *2307; 2 Thomp. Corp.* § *1234.* The *cestui que trust* is not only entitled to a part but to all the benefits.

It is also possible that the stockholders, individually, may recover from Black for deceit. The authorities are collated in the notes to section 2564 of *4 Fletch. Cyc. tit. "Corporations."* That possibility is not, however, involved in the proposition here presented and decided—that a president of a corporation cannot use corporate property nor his office for private gain.

I will advise a decree in favor of the Farmers Telephone Company for the amount received by Black from the Bell companies in excess of $50 a share, with interest. If there is any question as to the exact amount I will hear further testimony.

The complainants are entitled to costs.