On January 2d 1930, Leroy H. Gates died leaving a last will and testament dated December 20th, 1922, to which was attached a codicil dated August 6th, 1929. On January 13th, 1930, both were admitted to probate in Union county. The testator devised and bequeathed to his wife, Evelyn P. Gates, the complainant herein, his home and garage at No. 810 Central avenue, Plainfield, New Jersey, including their contents. His homestead property, with its contents, at North Wilberham, *Page 462 
Massachusetts, he gave and devised to his three children, Roy William Gates, Charles Patterson Gates, and Pauline Mary Gates Heely. His jewelry, clothing and personal effects, excepting household effects, he gave to his two sons, Roy and Charles Gates; to each of his children, Roy, Charles and Pauline, and his step-daughter, Charlotte Spencer Zelie, the daughter of the complainant, who all are defendants herein, he gave the sum of $5,000. His will, among other things, provided:
"Tenth: I give, devise and bequeath to the Plainfield Trust Compan of Plainfield, New Jersey, the sum of two hundred thousand dollars ($200,000), to hold the same in trust for my wife, Evelyn P. Gates, during her life, the income meanwhile to be paid over to her quarterly or oftener in the discretion of the trustee. On her death the principal of said trust estate and all accumulations thereof and increase therein shall be divided into as many equal shares as there are children of mine (the designations `my children,' `children of mine,' `child of mine' and the like to include a step-child, wherever such designations are used in this paragraph Tenth, but only in this paragraph Tenth) then living and children of mine who have died leaving children then living; and except as hereinafter provided I give, devise and bequeath one of such shares absolutely and forever to each of my said children then living, and in equal shares to the children then living of any child of mine who has died. * * *
Eleventh: All the rest, residue and remainder of my estate, of whatever kind and wherever situated, including all lapsed legacies, devises and bequests, I give, devise and bequeath to my executor in trust however until my son Charles Patterson Gates shall attain the age of thirty years, or if he shall die before attaining said age, then until my daughter Pauline Mary Gates Heely shall attain the age of thirty years or until her death if she also shall die before attaining said age, whereupon this trust shall terminate and the principal shall be distributed or held as hereinafter provided. In the meantime the trustee shall quarterly or oftener in its discretion divide the income in equal shares among my children Roy William Gates, Pauline Gates Heely and Charles Patterson Gates; except that if any of them shall have died before me, leaving children, or prior to the termination of said trust shall die leaving children, then the income to which such child of mine would have been entitled, or shall have been receiving, shall be used by the trustee for the support and education of his or her said children. * * *
Twelfth: With respect to and for the purposes of any trust herein created, the trustee is empowered to retain and hold any property or securities that I may own at the time of my death, or in its discretion to invest and reinvest the whole or any part of the principal of any trust fund in securities lawful for trustees' investments under the laws *Page 463 
of the estates of New Jersey and New York or either of them, and after paying the lawful expenses of administration shall apply and use or pay over the remainder of the income of any trust estate as hereinbefore provided.
Thirteenth: I give to my executor and its successors, and to any trustee hereunder, full power to sell at private sale or public auction any or all of my real estate wherever situated and to convert the same into cash for the benefit of my estate or of any trust, as the case may be, and to make such sales either for cash or partly for cash with the remainder secured by purchase-money bond and mortgage."
The defendant Plainfield Trust Company, a corporation, was named executor of the will.
The testator, in and by his codicil, increased the amount of the trust fund for his wife from $200,000 to $400,000; and by the same instrument, he raised the legacy to his step-daughter, Charlotte Spencer Zelie, from $5,000 to $25,000. The estate consisted of cash and investments in stocks and bonds, the net value of which was approximately $1,000,000.
The executor (hereinafter called the trust company), on February 27th, 1934, filed in the orphans court of Union county, its first intermediate account as trustee. Complainant, then, filed her bill. In consequence, the account of the trust company, as trustee, and its account as executor, came into this court. The bill mentions five counts, or separate causes of action, which "boiled" down are as follows:
1. The first count seeks a construction of the will and a direction to the trust company to pay to complainant the income on the trust fund of $400,000 from the date of decedent's death.
2. The second count charges that the trust company as executor and trustee is chargeable with the amount of $158,700 as to thecorpus of that fund because of its investment to that extent in securities issued by Plainfield Title and Mortgage Guaranty Company (hereinafter called mortgage company), in which mortgage company the trust company had a pecuniary interest and some of whose officers and directors were officers and directors of the trust company, and because such securities were not the kind which a trustee could purchase as they were not issued in accordance with chapter 81 of the laws of 1927. *Page 464 
3. The third count charges that the payment to complainant as life beneficiary of four and three-quarters per cent. upon the portion of the trust fund not set up within the time limited by law is less than that to which she is entitled and that the trust company is accordingly chargeable with interest at the legal rate of six per cent. as to the portion not set up.
4. The fourth count alleges that even if complainant, as a matter of law, is not entitled to income on the trust fund until one year after the date of decedent's death, this court in its discretion should direct the payment of income from the date of testator's death.
5. The fifth count charges that complainant was obliged to pay from her own funds the sum of $8,887.54 for inheritance taxes on her life estate and that she is entitled to recover from the trust the sum so paid by her.
Considering the issues in the order in which they are here related, the first point for decision is: When does the life tenant of a trust become entitled to the income? This question appears never to have been directly decided by the court of errors and appeals. In some of the lower courts, however, it arose where an estate was given in trust for the benefit of another for life, or for a term of years, with remainder over. Those courts failed to consider that the gift to the life tenant consisted of income only, not the corpus itself. They held that until the corpus had been paid over to the trustee (which was not required until after the expiration of one year), no income could accrue to the life tenant, and that such income which had previously accrued on it, became part of the residuary estate. But the supreme court, in Welsh v. Brown, 43 N.J. Law 38, this court, in Green v. Green, 30 N.J. Eq. 451, the prerogative court, in Davison v. Rake, 44 N.J. Eq. 506, and the court of errors and appeals, in Van Blarcom v. Dager,31 N.J. Eq. 783, in considering whether or not the life tenant of a trust composed of the rest, residue and remainder of an estate, or of a part thereof, was entitled to income from the date of the testator's death, decided against the one year rule regarding the payment of legacies and declared the life tenant was entitled to income from the *Page 465 
date of the testator's death. Many states hold that the life tenant of a trust, though not composed of the whole or a part of the rest, residue and remainder, is entitled to the income from the death of the testator.
In Welsh v. Brown, supra, it was held that a legacy, whether it be general, or of income on the trust fund, is not payable until one year after testator's death where no time is named by the testator, and there is absent any intention derived from the will itself. But there are exceptions to this rule which allow income or interest from the date of testator's death; they are:
1. A legacy given in satisfaction of a debt.
2. A bequest of the residue or a portion thereof in trust to pay the interest or income to the legatee for life.
3. The bequest of an annuity.
4. Interest on a legacy to a minor child of the testator, or to one to whom the testator stands in loco parentis.
The fourth exception stated, results from the age old rule of the natural obligation of a father to maintain his infant children, and his presumed intention not to deprive them of such maintenance. Ex'r of Kearney v. Kearney, 17 N.J. Eq. 59 (atp. 63); Brinkerhoff v. Garret Merselis' Executors,24 N.J. Law 680. In the last cited case Mr. Justice Green stated:
"The parent is under obligation to provide a present maintenance for his infant children, and the law will not presume him so unnatural as to leave the child destitute.
 * * * * * * *
"The exception does not extend to an adult child, nor to the wife of the testator, nor to the niece, nor even to a grandchild, unless the testator has placed himself in loco parentis to the legatee, or unless there be some circumstance showing that it was the intention of the testator that interest should be allowed."
In the Matter of Stanfield (Court of Appeals, 1892),135 N.Y. 292, it appears:
"Where the income of an estate or of a designated portion, is given to a legatee for life, we think it is clear that he becomes entitled to it whenever it accrues, and if the estate *Page 466 
is productive of income from the death of the testator, he can require the executor to account to him for the income from that time.
 * * * * * * *
"The gift of the income is independent of the gift of the principal; and the right to the income does not depend upon the investment, but was created and exists regardless of it. The direction to the executor, with respect to the investment of the fund, has reference to the administration of the trust, and cannot be available to defeat the legatee's title to income accruing previously to the time when the investment is required to be made. Until it is made an equivalent in value of the property out of which the fund is to be raised it must be deemed to stand in place of the investment, and whatever income arises from it meanwhile, belongs to the legatee to whom it has been expressly given."
Counsel for the complainant contends that the statement of Mr. Justice Green in the case of Brinkerhoff v. Garret Merselis'Executors, supra, while it was obiter dicta, should in the instant case, obtain the force of law and that the widow of the testator, whom the husband in life was obligated to support, should be surrounded with the same legal safeguards as the testator's infant children are in the matter of income. That contention should prevail if it finds support in the testator's will, or from the social circumstances of the testator and the complainant, by which it might appear that the complainant is entitled to the income on the trust fund from the date of the testator's death.
Schouler on Wills (5th ed.) § 466, says:
"Yet every will should be interpreted, as far as possible, from the standpoint apparently occupied by the testator; and attendant circumstances, such as the condition of his family and amount and character of his property, may and ought to be taken into consideration, as part of the res gestae where the language is not plain nor the meaning obvious. And the testator's intention ought at least to control any arbitrary rule, however ancient its origin, which is unreasonable or not well established, or doubtful in its immediate application."
White v. Graves, 104 Atl. Rep. 205; Sadler v. Bergstrom,113 N.J. Eq. 567; National Newark and Essex Banking *Page 467 Co. v. Arthur Sunshine Home, c., Blind Babies, 113 N.J. Eq. 313; Camden Safe Deposit and Trust Co. v. MacMullan, 112 N.J. Eq. 574; Crocker v. Crocker, 112 N.J. Eq. 203; Pierson v.Jones, 108 N.J. Eq. 453; affirmed, 111 N.J. Eq. 357; Glock v.Glock, 110 N.J. Eq. 477; Scull v. Rosecrans, 104 N.J. Eq. 143;Genung v. Best, 100 N.J. Eq. 250; In re Vanatta, 99 N.J. Eq. 339; Higgins v. Mispeth, 118 N.J. Eq. 575.
Roy and Charles Gates, and Pauline Heely are children of the testator by a former marriage. The present Mrs. Gates — Evelyn P. Gates, the complainant — and the testator were married in 1922. The complainant, at the time of her marriage to the testator, was a widow with one child, Charlotte Spencer Zelie, the defendant. After his marriage to the complainant, the testator, his wife, the complainant, his step-daughter, the said Charlotte Spencer Zelie, and his son, Charles, resided at the testator's home, No. 810 Central avenue, Plainfield, New Jersey. The testator's other two children, Roy and Pauline, were married prior to the marriage of the testator to the complainant.
The testimony indicates that the testator's financial contributions to his wife and children were most liberal. He opened two accounts with a stock brokerage firm in New York for the complainant. One of the accounts, was a trading account in which securities were bought and sold; the other was formed largely from interest and dividends received from the trading account. Against the latter account, complainant could draw by check. The complainant received moneys from the trading account at the direction of her husband. The evidence also discloses that the testator gave the complainant his checks for large sums of money which were used for the up-keep of the home, paying her own personal expenses, and for nurses' and doctors' bills for her husband, traveling expenses, hotel and other bills. The incidental expenses of the home preceding the immediate decease of the testator, ran from $25,000 to $28,000 per year.
During the year 1928, complainant's income from all sources was approximately $75,000 upon which she paid an *Page 468 
income tax of about $10,000. The testator left no cash legacy to the complainant. The $400,000 trust fund which the testator created for her, amounted to about one-third of his estate at the time he made his codicil to the will, in 1929. After the creation of the trust fund, the remainder over of testator's property, he directed should be held in trust until his son, Charles, arrived at the age of thirty years; in the meanwhile, the income therefrom was to be paid in equal shares to each of his three children. When Charles should arrive at the age of thirty years, the corpus was then to be paid in equal shares to testator's three children.
At the time of the testator's death, the complainant, notwithstanding the decedent's generous contributions to her, had on hand in cash but, approximately, $5,000. She, after the testator's death, was forced to borrow money for her support and she pledged her stock for the purpose. Considering the station in life which the complainant and her husband occupied, their social status, their standard of living, the munificent financial allowances made by the decedent to the complainant, and other circumstances surrounding their marital existence, it would, I believe, be inequitable to assume that it was not the testator's intention to make such pecuniary provision for the complainant as would become effective immediately upon his demise.
Attention is directed to that portion of paragraph Eleventh of testator's will which reads as follows: "In the meantime the trustee shall quarterly or oftener in its discretion divide the income into equal shares among my children, Roy William Gates, Pauline Mary Gates Heely and Charles Patterson Gates * * *." Counsel ascribes to the words "In the meantime," that the children should receive the income from the trust quarterly or oftener following the testator's death, and that the receipt of it should not be deferred for one year. He points to the similarity of the terms of paragraph Tenth of the testator's will, in which provision is made for the trust estate for the complainant, whereby the income "meanwhile be paid over to her quarterly or oftener in the discretion of the trustee." Counsel argues that the word "meantime" signifies *Page 469 
the interval commencing at the date of testator's death. "Meantime" and "meanwhile" are defined as "during the interval between two given times; during the intervening time; during the interval; at the same time."
Complainant's counsel argues that the real intent of the testator by the use of the word "meanwhile" was to establish as the duration of the trust, the interval between the testator's death and her own death. That contention, the trust company disputes. It takes the position that until the corpus of the trust estate was paid over to itself as trustee, all income previously earned thereon belonged to the residuary estate, and that it, as executor, could not pay the corpus to itself as trustee, until one year after testator's death. I believe complainant's counsel stands on firm ground in his argument. I do not take the same view of the situation as counsel for the trust company holds. I am inclined to agree, and do agree, with the thought expressed by counsel for the complainant.
The trust company takes the position that when it set up a portion of the trust estate on May 31st, 1930, thereupon, the interval as to that portion commenced; and that when, on December 31st, 1930, it set up another portion of the trust estate, therefore, the last date was the interval commenced as to that portion; and that as to the remaining portion, which had not been set up as part of the trust estate, the interest as to it commenced one year after the testator's death. That attitude, if accepted as being the correct position of the trust company in the premises, would, in my opinion, nullify the meaning of the word "meanwhile" as I believe it was intended to be used by the testator — being the interval between two given times. Such acceptance of the word "meanwhile" would stamp its use in the will as empty, meaningless and ineffective. It was not there used for "ornamental" purposes; it was deliberately inserted for a certain and precise reason. The word, as I have indicated, has a definite meaning; it shows a given time when the interval shall commence, which in this instance, I am convinced is the date of the testator's death. The trustee, it appears *Page 470 
assumed control of the complainant's trust within two months following the testator's death.
The circumstances and facts here present warrant the conclusion that the complainant is entitled to income from her trust estate from the date of the death of the testator. She is therefore entitled to income from so much of her trust estate as was not set up until the same was actually set up. Howe v. Earl ofDartmouth, 7 Ves. Jr. 137; 32 Rep. 45; Ackerman v. Vreeland,14 N.J. Eq. 23; Gaede v. Carroll, 114 N.J. Eq. 524;169 Atl. Rep. 172. Said income should be computed at the legal rate of interest from January 2d 1930. As no part of her trust estate was set up until June 1st, 1930, at which time $200,000 was set up, she is entitled to interest at the legal rate on her entire trust estate from January 2d 1930, to June 1st, 1930, amounting to the sum of $10,000; she is also entitled to interest on the remaining $200,000 from June 1st, 1930, to January 2d 1931 (when $100,000 more was set up in her trust estate), amounting to the sum of $7,000. On the remaining $100,000 she is entitled to interest from January 2d 1931, to May 18th, 1931 (when $25,000 was set up) and to interest on $75,000 from May 18th, 1931, to July 30th, 1932, when the remaining $75,000 was set up. But as the trustees paid her income at the rate of four and three-quarters per cent. on the last referred to $100,000 not set up until after January 2d 1931, she is entitled to receive on that amount the difference between what six per cent. thereof would amount to and the four and three-quarters per cent. she actually received, to wit, interest on $100,000 at the rate of one and one-quarter per cent. from January 2d 1931, to May 18th, 1931, amounting to $468.72, and on the remaining $75,000 from May 18th, 1931, to July 20th, 1932, when that sum was set up, amounting to the sum of $1,130.74. As this is all income wrongfully withheld from complainant, she is entitled to interest thereon from the dates when the aforementioned amounts were actually due as aforesaid.
The complainant charges that the participation certificates of the mortgage company, in which the trust company has *Page 471 
invested $158,700, were not lawful investments for trust funds. Provision is made for trustees' investments in shares of bonds and mortgages in chapter 192 of the laws of 1920. That act is a supplement to "An act concerning the investment of moneys and the retention of investments in certain cases," approved March 23d 1899.
The 1920 act is amended by chapter 144 of the laws of 1922. The 1922 act extends the right of a fiduciary to invest in "bonds secured by a trust mortgage." Then, chapter 305 of the laws of 1926, amends the 1920 act and also chapter 144 of the 1922 laws. It extends the right of a trustee to include in the trust estate:
"* * * participation certificates or coupon bonds which shall entitle the holder to a proportionate share in a series or number of mortgages and bonds or extensions or renewals thereof, deposited under a trust agreement with a trust company, bank or title guarantee corporation, which shall be a first lien upon improved real estate, provided the amount of such mortgages shall not at the time of the making of such loan exceed sixty per centum of the estimated worth of the real estate covered by such respective mortgages."
It further provides that:
"Any trust company, title company or bank incorporated under the laws of this state and authorized by its charter to transact the business of loaning money on bond and mortgage upon improved real estate, which are first liens thereon, may isue participation certificates or coupon bonds with a guarantee of payment of principal and interest and secured by a trust mortgage or trust agreement deposited with a trust company, bank, or title company organized under the laws of this state, which trust mortgage or agreement may include a number of bonds and mortgages and shall designate them as a series set apart as security for such participation certificates or coupon bonds and refer to them by brief description of dates, parties, amounts, reference to location of property, maturity and rate of interest. Such trust agreement or mortgage shall contain suitable provisions for substitution and extension of mortgages and bonds secured thereby and it shall not be necessary to insert such details in the participation certificates or coupon bonds other than by reference to such trust mortgage or agreement."
It is to be noted that the 1920 act was the first act which permitted a trustee to invest in a part of a mortgage. The *Page 472 
1926 act permitted a trustee, for the first time, to invest in participation certificates in a number of bonds and mortgages. The 1926 act was amended by chapter 81 of the laws of 1927; but the amendment did not materially alter the last quoted paragraph of the 1926 act.
The complainant takes the position that the participation certificates of the mortgage company purchased by the trust company as trustee, do not meet the requirements of the statute, in consequence of which, the trustee was, and is, barred from investing in them. The certificates were issued pursuant to a resolution passed by the directors of the mortgage company, and an agreement between it and the Title Guarantee and Trust Company, as trustee. The resolution provides that the company issue not more than two thousand
"`First Mortgage Participation Certificates,' Series B at Five and one-half per centum (5 1/2%) per annum interest payable semi-annually * * * in denominations to be written in on each bond as issued, said bonds to be issued pursuant to the terms and conditions of a certain agreement form of which is hereafter set forth, made between the Plainfield Title Mortgage Guarantee Company and The Title Guarantee Trust Company of Plainfield as Trustee, said `First Mortgage Participation Certificate' to be of similar form and tenor to the certificate hereinafter set forth: * * *
"And from time to time as the business of the company shall require, the President and Secretary of the company are authorized to execute and issue the `First Mortgage Participation Certificates' herein authorized in accordance with the terms and conditions therein contained and subject also to the conditions of the agreement with the Trustee."
The agreement, among other things, provides as follows:
"First: That the issue of said `First Mortgage Participation Certificates' shall be in such aggregate sum or sums, in series or otherwise, bear such date or dates of issue and mature at such time or times and bear such rate of interest, not exceeding six per centum (6%) per annum as said Title Company by and through its Board of Directors, shall from time to time, hereafter determine, and any and all other details, conditions and particulars, respecting the issue thereof, shall be, from time to time, determined and fixed by said Board of Directors of said Title Company and be duly certified by the said Trustee.
Second: That the said Title Company hereby agrees to and with the said Trustee above named * * * that it will deposit with said *Page 473 
Trustee, bonds accompanied and secured by real estate mortgages * * * and the said Title Company will keep on deposit with said Trustee at all times such mortgages of a face value or a par value equal to the aggregate face value of all `First Mortgage Participation Certificates' outstanding, to secure the payment of which such mortgages shall have been specifically pledged, together with the bonds thereby secured, which shall be held by the Trustee to secure the equal proportionate payment of all such outstanding `First Mortgage Participation Certificates' with interest thereon, as the said bonds and mortgages shall have been specifically and respectively pledged and deposited to secure payment of.
Third: It is hereby agreed that the Title Company may, from time to time, as the exigencies of its business may require, withdraw any bond and mortgage, or bonds and mortgages, so deposited with the said Trustee and substitute other bonds and mortgages in their stead * * *.
And it is further agreed that notwithstanding such deposit and pledge of bonds and mortgages, the Title Company may receive from the obligors and mortgagors payments from time to time, of the interest and principal due thereon, either in installments or otherwise, but shall promptly, on the First day of each month or on request of the Trustee, render a written statement to the said trustee showing the amount of principal then due upon all the bonds and mortgages then held by said Trustee and a full and correct statement of the condition and amount of the collateral held by it as aforesaid.
Fourth: * * * The character and value of the mortgage loans to be deposited as security for the payment of the said `First Mortgage Participation Certificates' are not known to the Trustee, except as may appear by the papers accompanying the said bonds and mortgages and as certified by the Title Company, and the said Trustee will make its certificate on this basis and with this understanding.
Fifth: * * * All the said `First Mortgage Participation Certificates' shall be numbered, in due course, continuously and consecutively, and may be in one or more series; the bonds of each series to be numbered consecutively and shall be certified, and issued in the order of their numbers and series, if issued in series and a careful record kept for the said Trustee of these issued.
Sixth: The Trustee shall certify any of said `First Mortgage Participation Certificates' as and when requested by the Title Company, provided a sufficient amount of bonds and mortgages shall have been deposited with it as security therefor.
Seventh: The Board of Directors of the Title Company may by resolution, with or without cause and in its own absolute discretion, declare the place of the Trustee herein named, or the place of any successor or substitute of the Trustee herein named, vacant * * * and may designate and appoint a new trustee to fill the vacancy.
Eighth: * * * In case of default in payment of principal or interest of said Participation Certificates or any of them the said trustee may proceed to sell said mortgages and bonds * * * and *Page 474 
apply the proceeds * * * to payment of principal and interest accruing on First Mortgage Participation Certificates. * * *
Eleventh: The said Trustee * * * shall not be held liable for keeping any accounts of said First Mortgage Participation Certificates but same shall be kept for it * * * by the Title Company."
The participation certificates, known as Series "B," purchased by the trust company, as executor, and turned over as part of complainant's trust, and the certificates purchased by the trust company, as trustee for complainant's trust, were issued pursuant to the terms of the foregoing agreement. These certificates, among other things, declared that the mortgage company had assigned and transferred to the registered owners thereof —
"an undivided proportionate share equal to the face value hereof in and to certain bonds secured by mortgages owned and to be owned by said company, covering real estate in the State of New Jersey, held and to be held in special deposit under a certain deposit agreement between said company and The Title Guarantee and Trust Company of Plainfield, New Jersey, as trustee, bearing date August 5th, 1927, said bonds and mortgages calling for the payment of an amount in the aggregate of not less than the face value of the share in said bonds and mortgages assigned hereby together with all other shares represented by `First Mortgage Participation Certificates' of this series, similar hereto in tenor, issued and to be issued, by this company and at any one time outstanding, such participations to be proportionate and pro rata.
(5) That the company shall have the right, at any time, to withdraw and substitute bonds and mortgages as provided and authorized by the said Deposit Agreement, which agreement is made a part hereof;
(6) That the company may be the owner or pledgee of this certificate in the same manner as any third person without the extinguishment hereof and that the same is subject to re-issue."
The trust agreement was executed August 5th, 1927. The evidence indicates that the last certificate was numbered 2009. Many certificates had been re-issued and quite a number had been canceled. The principal sum of the mortgages that had been deposited against which the certificates were issued varied. It appears that the amount "went up and down" in a sort of "see-saw" style. When, on July 1st, 1930, the trust company, as executor, purchased $100,000 worth of certificates, *Page 475 
there were mortgages on deposit of $3,250,400. Certificates were issued against them in the sum of $3,077,346. On December 31st, 1930, at the time $100,000 worth of certificates were turned over by the trust company to itself as trustee of the complainant's trust, the mortgages on deposit amounted to $3,903,350. The certificates issued against them amounted to $3,864,746.
It is quite apparent that title companies, and other institutions who have been issuing participation certificates lawful for trust estates as required by statute, have to do certain things, to wit: A trust agreement must be executed between it and another trust company, whereby bonds and mortgages are to be deposited. The bonds and mortgages are to be in existence when the trust agreement is executed, and they are to be set aside by the trustee under such agreement as security for the certificates to be issued by the title company. Such bonds and mortgages are to be described in the trust agreement briefly by dates, parties, amounts, reference to location of property, maturity and rate of interest. Those details are mandatory by the statute. The statute makes provision for the withdrawal of mortgages, and for the extension of mortgages which are not paid on their due date, and it provides that the trust agreement shall "contain suitable provisions for substitution and extension of mortgages and bonds secured thereby * * *." The statute seems to be ignored in the agreement between the mortgage company and the Title Guarantee and Trust Company of Plainfield (now the Plainfield National Bank), because there is "no series or numbers of bonds and mortgages" designated "as a series set apart as security for such participation certificates." The statute expressly asserts that some definite number of bonds and mortgages be set apart as security. What was done from time to time, was to deliver to the "trustee" a number of bonds and mortgages against which the title company issued participation certificates in various amounts which covered the aggregate face value of such participation certificates outstanding, but did not exceed the aggregate value of the bonds and mortgages held by the trustee. *Page 476 
The agreement, in effect, provides that there will be no definite number of bonds and mortgages, or a closed series held by the trustee as security. In other words, there is to be no limit to the aggregate amount of the participation certificates that may be issued, and there will be no limit to the number and face value of the bonds and mortgages that may be lodged with the trustee as security for them.
It is contended that the legislative act, quoted herein, authorizing the substitution and extension of bonds and mortgages held by the trust agreement, contemplated a substitution for mortgages that have matured and been paid, but, in my opinion, it cannot be taken for granted that there can be any general substitution as the said agreement of August 5th, 1927, contemplates in the third paragraph thereof, where it says:
"It is hereby agreed that the Title Company may from time to time as exigencies of its business require withdraw any bond and mortgage or bonds and mortgages so deposited with the said Trustee and substitute any other bonds and mortgages in their stead."
Certainly, it was not the legislative intention to bestow upon the title company any such power. The legislature undoubtedly intended that the purchaser of the participation certificate could readily determine what properties were covered by the certificate. In the instant case no such identification can be made. The agreement says the title company has assigned and transferred to the registered holder thereof "an undivided proportionate share equal to the face value hereof in and to certain bonds secured by mortgages owned and to be owned by said company covering real estate in the State of New Jersey held and to be held in special deposit under a certain trust agreement * * *." This provision enables the title company to offer as security mortgages that had not existed at the time the certificates were issued. Such practice finds no support whatever under the laws of this state, and, in my opinion, its adoption is without warrant or justification. The testimony is to the effect that many of the deposited mortgages were withdrawn as they became due, *Page 477 
and were paid, and others were substituted in their place. Certainly, such practice was not a compliance with the terms of the statute. Under such circumstances, how is it possible for a trustee to determine whether the security for the certificates was safe, good or bad? Probably, by an investigation of the titles encumbered by the different mortgages which were lodged with the trustee, and an appraisal made of the property covered in such mortgages.
Another element that must be considered is the statutory mandate that trustees are not permitted to invest trust funds in bonds and mortgages where the mortgages exceed sixty per cent. of the estimated value of the real estate covered by them. The 1927 act says that trustees may invest in participation certificates secured by a series or number of mortgages "which shall be a first lien upon improved real estate provided the amount of such mortgages shall not at the time of making such loan exceed sixty per cent. of the estimated worth of the real estate covered by such respective mortgages." The last quoted provision of the statute is a clear direction to the trustee to ascertain that the mortgage covering the premises does "not exceed sixty per cent. of the estimated worth of the real estate." There is nothing ambiguous about the language or the purpose of the act.
The testimony in the instant case indicates that when the trust company purchased the certificates for the trust estate, it made no investigation of the value of the mortgaged premises encumbered by the mortgages pledged with the trustee. It relied upon the original appraisal made by the committee of the title company who issued the mortgages. Surely such procedure by a trustee is not a compliance with the duty the law imposes upon him. Its conduct may most aptly be described in the homely phrase of "buying a pig in a bag." The trustee must be acquainted with the security behind its investment. It is required to act prudently and diligently. It can take nothing for granted. It must exercise vigilance in choice of selection. It must purchase with eyes that perceive and a mind alert to the interests of its trust. It is *Page 478 
stated by Bogert in his work, The Law of Trusts and Trustees, volume 3, page 1836, that —
"The trustee owes a duty to the cestui on taking over property from the executor to examine the property tendered and see whether it is that which he ought to receive. If the executor is under a duty to deliver money to the trustee, and tenders corporate stock in which the executor has wrongfully invested the funds of the estate, the trustee may render himself liable to thecestui by accepting such a tender. The trustee should familiarize himself with the duties of the executor toward him and exact accurate performance of these duties. The trustee should also inquire of the executor concerning the history of all the property tendered, since it may be improper for the trustee to know whether the property delivered was purchased by the testator himself or is an investment made properly or improperly by the executor. The trustee owes the beneficiary a duty to sue the executor for damages for failure to deliver over to the trust the proper amount and kind of property."
And (at p. 2058):
"A trustee in taking office, either by receipt of the trust property from the executor, or upon his appointment as the successor of a sole trustee, or upon entering a group of trustees, owes the cestui que trust the duty of examining the trust property, possession of which is tendered to him, for the purpose of ascertaining whether it corresponds in kind and amount with that which ought to be delivered to him. He also has a duty to learn whether the trust property being held at that date is property which may lawfully be held by the trustee or trustees, in view of all relevant clauses in the trust instrument, the statutes of the state which are germane, court decrees affecting the trust, the needs of the trust, and the characteristics of the securities in question. He must make up his mind whether the existing trust investments are legal or illegal, judged by the standard of reasonable care, if that is the only controlling factor, or judged by controlling trust clause, statute, or decree and the use of reasonable prudence."
Brigham v. Morgan, 185 Mass. 27; 69 N.E. Rep. 418 (at p.424).
An opinion which closely approaches the situation under consideration is In re Stupack's Estate, 154 Misc. Rep. 759;278 N Y Supp. 403 (March 14th, 1935). In that case, a trustee was surcharged for the loss sustained by reason of his purchase of certificates not properly issued. While the *Page 479 
New York statute is somewhat different from our own quoted statutes, the opinion is apposite and forceful. It expresses with admirable clarity the principles which I feel are applicable to the instant case. I quote from it extensively. It among other things says:
"The question squarely presented for determination, therefore, is as to whether the series F-1 certificates of the New York Title and Mortgage Company were legal investments for the trust funds of this infant.
 * * * * * * *
"The genesis of the New York Title and Mortgage Company class `F-1' certificates is found in an agreement dated February 21st, 1927, between this company and its subsidiary, the American Trust Company. This instrument, while burdened with the verbosity which appears prevalent in documents of this character, provided, in substance, that the title company should deposit with the trust company an unspecified number of bonds and first lien mortgages on improved real property in New York City, together with appraisals showing the values of the respective properties encumbered to be at least fifty per cent. greater than the amounts of the mortgages secured thereby, and that from time to time, as requested by specified officers of the title company, the trust company would issue `Certificates of Interest' in a form specified in the agreement, to a total not exceeding `the total principal sum secured to be paid by the deposited bonds and mortgages then held by the "trust company" and owing thereon.'
 * * * * * * *
"The title company is `appointed irrevocably the agent' of all certificate holders, `(a) to collect the interest and principal of the deposited bonds and mortgages, and to satisfy and discharge the same in its own name; * * * (c) to decide when and how to enforce any provision of the said bonds and mortgages, and in its own name to enforce the same, and in all respects to pursue any remedies which any owner of said bonds and mortgages might pursue; to receive *Page 480 
payment of principal or interest thereon in advance; (d) to withdraw from deposit deposited bonds and mortgages and to substitute other first mortgages * * * in their place, to such an amount that the principal sum of all deposited bonds and mortgages shall never be less than the principal sum of the outstanding certificates of interest; * * * any bonds and mortgages so withdrawn shall thereby be released and discharged to all intents and purposes, of and from all right, title and interest on the part of the holders of any certificates of interest which at the time may be outstanding or which shall be issued thereafter, and the bonds and mortgages deposited in their place shall thereby become subject to the terms of this agreement.'
 * * * * * * *
"The real gist of the transaction is obvious. The title company was in the business of placing and selling mortgages. It acquired a number of such mortgages which constituted the goods which it had for sale. It borrowed money from the general public for the financing of its business and deposited as security for such borrowing a portion of its stock in trade without in fact losing control over the portions so deposited, so far as its general business operations were concerned.
"The question for determination is purely as to whether the placing of this infant's funds in this sort of a security is an investment in one or more bonds and mortgages or in shares or parts of one or more bonds and mortgages within the intendment of section 111 of the Decedent Estate law. On the record the reply must obviously be in the negative.
"On the demonstrated facts these certificates constituted merely a promise to pay, secured by a pledge of mortgage collateral over which the promisor had the absolute power of control. It seems strange to the court that it can seriously be contended that such a transaction constituted an investment `in shares or parts' of `bonds and mortgages.'
"As the court of appeals has pertinently remarked respecting such a transaction: `Certainly the holder acquires, prior to default, no rights in the mortgages, other or greater than *Page 481 
the rights of a holder of collateral security * * * the guaranty company is a primary debtor, assigning the mortgages only as collateral security for the debt.' (Matter of People (Tit. Mtge. Guar. Co.), 264 N.Y. 69, 88.)
 * * * * * * *
"It follows that this investment was merely in notes of the New York Title and Mortgage Company, and not in bonds and mortgages or in shares or parts thereof, and, therefore, not within the protection of section 85 of the Domestic Relations law and section 111 of the Decedent Estate law, and that the first objection of the special guardian must be sustained.
"The second objection, as noted, is to the effect that the investment was `improvident and unwarranted.' Whereas the court cannot, for the reasons stated, sustain this objection of the basis of the reason assigned by the special guardian, it deems it well founded on the fact demonstrated by the record that the sole security afforded was at the absolute mercy of the promisor. The trustee was its subsidiary, the values of the collateral securities were wholly fixed by its employes and such securities could be withdrawn at will and replaced by others, the determination of whose values was likewise solely within the power of the principal debtor. It was authorized to collect, satisfy and discharge all of the collateral obligations in its own name and `to decide when and how' (if at all) any collateral obligation should be enforced.
"It has been firmly established in the law since the days ofKing v. Talbot, 40 N.Y. 76, 88, that it is the duty of trustees to retain in their own hands and custody and management of the securities composing the corpus of the trust fund. * * * If the making of an investment of this type does not constitute improvidence on the part of a fiduciary, it would be difficult to conceive of an act within the connotation of the term.
 * * * * * * *
"It follows, therefore, that since these investments were not in bonds and mortgages or parts of the same within the *Page 482 
express language of section 111 of the Decedent Estate law, they were not legally authorized investments for the present accountant, wherefore, a surcharge must be imposed for the loss which has resulted to the estate from this manner of dealing with its funds."
The evidence discloses that in, or about, the year 1927, the trust company acquired fifty-one per cent. of the capital stock of the mortgage company; and in 1930 it held over fifty per cent. of the outstanding capital stock of that company. On June 12th, 1930, it, as executor, purchased $100,000 of participation certificates from the mortgage company, and, in the same year, on December 31st, 1930, transferred to itself, as trustee of complainant's trust, the certificates purchased in June, and additional certificates in the same company in the amount of $58,700. Many of its officers and directors were officers and directors of the mortgage company. Harry H. Pond, president and director of the mortgage company, was also president and director of the trust company; DeWitt Hubbell, vice-president and director of the mortgage company, was vice-president and director of the trust company; F. Irving Walsh, assistant treasurer, assistant secretary and director of the mortgage company, was vice-president, secretary and director of the trust company; H. Douglas Davis, title officer of the mortgage company, was treasurer and trust officer of the trust company. While the two companies are distinct corporate entities, it is obvious from the facts stated that their interests were not separate and distinct, but that the trust company had a considerable interest in, and control over, the mortgage company.
The trust company directs attention to the fact that the decedent, at the time of his death, was a director of the trust company, and had been since December 20th, 1923; that he was connected with the Special Department and Safe Deposit Department Committee. That he, on October 21st, 1926, attended a meeting of the board of directors of the trust company at which, upon the recommendation of the executive committee, of which he was a member, it was resolved "that the board of directors approve the purchase of the majority *Page 483 
interest in the capital stock of the Plainfield Title and Mortgage Guaranty Company * * *;" that he was present at a meeting of January 20th, 1927, at which time the president reported the purchase; that on January 18th, 1928, he was appointed a member of the Special Department and Safe Deposit Department Committee and so remained until his death; that he was present at a meeting of the board of directors on January 15th, 1925, at which was reported the purchase of $11,000 guaranteed five and one-half per cent. mortgage certificates of the mortgage company for the trust department; that he was present at a meeting of the board of directors on January 20th, 1927, at which was reported the purchase of $19,000 of certificates of this mortgage company to be used for investments in trusts; that he was present at a meeting of the board on May 19th, 1927, at which was reported the purchase by the trust company of certificates of the mortgage company, and also certificates of Fidelity Union Title and Mortgage Guaranty Company, for various trusts, one a trust as guardian; that these certificates were the same type, and the same series, which the trust company bought as trustee for complainant's trust; that the minutes show that regularly, from time to time thereafter, down to June of 1929, or within six months of the death of the testator, he was present at meetings of the board of directors at which reports were made indicating that the trust company was purchasing for trusts in its control from the mortgage company the same type of securities which the trust company, after the death of the testator, purchased for the estate.
But such array of facts, which the trustee emphasizes, cannot warrant the conclusion the trust company was justified in departing from its plain duty to cling strictly to legal investments. The testator, despite his activities as a director of the trust company, his evident knowledge of its interest in the mortgage company, and his acquaintance with the purchases by the trust company of mortgage certificates from the mortgage company, did not, in his will, or codicil, authorize the purchase of such certificates. While, in life, he, as a director of the trust company, sanctioned certain practices, *Page 484 
still his testament conveys no mandate to his representatives to pursue the same rule of conduct. Vice-Chancellor Berry, inBlanchard v. Blanchard, 116 N.J. Eq. 435, said: "but it is not so much what he intended as what he did in fact do, unless the plain intent is contrary to the fact. We may not guess at his intent, but must find it in the language of his will."
The mortgage company during the years 1927, 1928, 1929 and 1930, paid dividends in the amount of approximately six per cent. Counsel for complainant, considering and discussing the officers of both companies, suggests the inference that it was to the advantage of the trust company, as the owner of the majority of the capital stock of the mortgage company, that the business of the mortgage company should prosper not only so that it might receive dividends, but, also, that its investments be protected. It may not be without the pale of reason to assume that the trustee's said purchases contributed to the sum total of the accrued dividends. But I am not asserting such to be the fact.
Under paragraph Twelfth of the testator's will, the decedent empowered the trustee to retain and hold any property or securities that he might own at the time of his death. The executor's account shows that the trust company in June, 1930, purchased $100,000 worth of guaranteed mortgage participation certificates, which it retained until Decem- 31st, 1930, when it turned them over to itself as trustee. The complainant charges that the trustee was authorized to accept only cash for securities that were in testator's estate at the time of his death. I am inclined to agree with the contention of the complainant. The trustee, I feel, was in duty bound to accept as trustee the kind of property he was obliged to take under the will, viz., legal securities only. In re Brown, 112 N.J. Eq. 499.
Vice-Chancellor Backes, in Shanley's Estate v. FidelityUnion Trust Co., 108 N.J. Eq. 564, placed his finger on the "sore spot" resulting from the investment made in that oftcited case, and expressed it, in part, in the following illuminating language: *Page 485 
"Our trustee is not possessed of an independent and impartial judgment as to the advisability of selling the stock, and, if it be advisable, at what price. A half dozen or more members of its board of directors are directors of the Public Service Company. They represent both buyer and seller. As stockholders of the Public Service Company they have a pecuniary interest in the sale. It may be slight, but that is unimportant. They are our trustees, and the law demands of trustees the utmost fidelity. It does not tolerate personal dealing with the trust estate nor permit the making of a penny's profit. The rule is grounded in sound morals and is reflected in the supplicating words of the Lord's prayer, `lead us not into temptation.' This is not an imputation upon the motives of the directorate of our trustee, but a simple statement of an elemental doctrine of the obligations of trustees. Further, these directors of our trustee owe a corresponding duty of loyalty to the Public Service Company, of which they are also trustees — directors are trustees. A trustee cannot serve two masters, with sharply conflicting interests, equally well. It had been tried before. It cannot be done. A simple illustration: The directors of our trustee are in conscience bound to consider only the welfare of our wards and strive for the best price obtainable; as directors of the Public Service Company, their duty is no less to secure the most favorable terms. The true balance is infinite. Trustees are not privileged to experiment with it. In the dilemma in which it found itself, the course open to our trustee was to apply to the court for instructions, not to compel our wards to appeal for protection."
In the most recent case of McAllister v. McAllister,120 N.J. Eq. 407, Vice-Chancellor Sooy said:
"The duty of a trustee is to administer the trust committed to his care solely in the interest of the beneficiary and he is not permitted to place himself in a position where it would be for his own benefit to violate his duty to the beneficiary.
"The policy of equity is to remove any possible temptation from a trustee. It does not tolerate personal dealing with the *Page 486 
trust estate, for the reason that a trustee cannot serve two masters with conflicting interests."
It does not seem necessary to further express the rule beyond calling attention to the consideration given to it inRestatement of the Law of Trusts 436 § 170, where the rule is expressed as follows:
"i. Sale to trust by corporate trustee. A corporate trustee violates its duty to the beneficiary if it purchases property for the trust from one of its departments, as where it purchases for the trust securities owned by it in its securities or banking department. A corporate trustee cannot properly purchase for the trust property owned by an affiliated or subsidiary corporation in which it has the entire interest or a controlling interest or an interest of such a substantial nature that there would be a temptation to consider its own advantage in making the sale and not to consider solely the advantage to the beneficiaries of the trust. The rule is the same where the shares of the selling corporation are owned by the shareholders of the corporate trustee. So also, a corporate trustee cannot properly purchase property for the trust from one of its officers or directors."
The good faith of the mortgage company in making the investments is not questioned. The law makes no distinction as to the sincerity behind the act of investing where the investment is without the bounds of legal approval. The trust company, having an interest in the mortgage company, and owing a duty of loyalty to the trust estate, might be faced with the embarrassing prospect of having to take a position in favor of one of two conflicting interests. Its loyalty, in the circumstances, is not separable. Then, in such event, which of those interests would it serve? Keely v. Black, 90 N.J. Eq. 439; Magruder v. Druryand Maddox, Trustees, 235 U.S. 106.
The trust company in its assertions of good faith, and, in support of its conduct, called a number of witnesses, prominent in the banking world, to testify that it was proper practice for a bank acting as trustee, and owning stock in a title company, to purchase participating certificates with trust funds from the title company in which it was financially interested; yet, the evidence of such practice lends no merit to its legality. While I entertain feelings of the utmost admiration for the persons of many of those eminent witnesses, *Page 487 
I, legally, cannot subscribe to their declared practice. Sound legal authority condemns it. As between the choice of what appears to be the questionable practice of bankers, and a well defined policy of the law, the courts are bound to ignore the former and adhere to the latter.
In Wendt v. Fischer, 243 N.Y. 439; 154 N.E. Rep. 303, Mr. Justice Cardozo, speaking for the court of appeals, said (at p.304):
"If dual interests are to be served, the disclosure to be effective must lay bare the truth, without ambiguity or reservation, in all its stark significance. Dunne v. English,L.R. 18 Eq. 524; Imperial Merc. and Credit Association v.Coleman, L.R. 6 H.L. 189. Finally, we are told that the brokers accounted in good faith, that the terms procured were the best obtainable at the moment and that the wrong, if any, was unaccompanied by damage. This is no sufficient answer by a trustee forgetful of his duty. The law `does not stop to inquire whether the contract or transaction was fair or unfair.'"
To the same effect is the principle laid down in Meinhard v.Salmon, 249 N.Y. 458; 164 N.E. Rep. 545; Munson v. Syracuse G.and C. Railway Co., 103 N.Y. 58 (at p. 74); 8 N.E. Rep. 355
(at p. 358). In Quinn v. Burton, 195 Mass. 277;81 N.E. Rep. 257, the supreme judicial court of Massachusetts held:
"It is a principle universally recognized, as founded not only on common business morality, but on a sound public policy, that persons who act in a representative capacity, whether styled executors, administrators, trustees, or agents, are not permitted, in the performance of their duties, to put themselves in a position antagonistic to the interests of those whom they represent. [Citing cases.] If, in fact, the principal suffers no harm, or may have been benefited, this inquiry is unimportant, as the object of the law is, to secure fidelity in the discharge of fiduciary duties, uninfluenced by considerations which necessarily are corrupt in their tendencies."
Mangels v. Safe Deposit and Trust Company of Baltimore,167 Md. 290, 173 Atl. Rep. 191; 3 Bogert, Law of Trusts and *Page 488 Trustees (1935) 1542; In re Richardson's Will, 149 Misc. 192; 266 N.Y. Supp. 388; Booth v. Greer Inv. Co., 52 Fed. Rep.
2d 857; affirmed, 62 Fed. Rep. 2d 321; In re Ahrend,3 N.J. Mis. R. 746; 130 Atl. Rep. 219; Jackson v. Smith,254 U.S. 586; Veterans' Administration v. Hudson's Estate (Md.),179 Atl. Rep. 836; 3 Bogert, The Law of Trusts and Trustees 1541 §489; Restatement of the Law of Trusts 560 § 206; Stewart v.Lehigh Valley Railroad Co., 38 N.J. Law 505.
In McAllister v. McAllister, supra, is stated:
"In order to bind a cestui que trust by acquiescence in a breach of trust, it must appear by full and satisfactory proof that he knew all the facts and was apprised of his legal rights and was under no disability to assert them; that he acted freely, deliberately and advisedly, with the intention of confirming a transaction which he knew, or might or ought, with reasonable or proper diligence, to have known to be impeachable."
The trust company insists that the complainant consented to the investment in the participation certificates, and that she was familiar with the transaction. This is disputed by the complainant. I am convinced that the trust company did not make a full and complete disclosure of the trust investments to the complainant. Ross v. Savings, Investment and Trust Co.,120 N.J. Eq. 87. There is nothing in the evidence that clearly shows the complainant consented. I believe that the investment was made without her consent.
I feel that the trust company should be surcharged with the amount it paid for the said securities, together with interest thereon from the date of such purchase, less the amount of interest actually received by it and for which it has charged itself in the account.
The complainant states that through the advice of the president of the trust company, Mr. Pond, she turned over to the trust company $8,887.54 to pay the inheritance tax levied by the State of New Jersey against the trust estate. She testified that relying upon his advice, she borrowed $12,000 from the trust company from which sum she deducted the *Page 488a 
amount of the inheritance tax and turned it over to the trust company to be applied by them to the payment of such tax. The trust company replied that it was advised by its counsel that the inheritance tax was chargeable against the income arising from the trust estate. Complainant says she consulted her husband's former counsel, who, she assumed, was acting as counsel for the estate, and he told her that the bank ought to know what it was doing as it was handling estates all the time. The complainant undoubtedly misapprehending her rights in the premises, through faulty advice, or improper suggestion, paid the tax. "Transfer taxes existing against a life estate are payable out of thecorpus of the estate, not the income." In re Diehl, 88 N.J. Eq. 310; affirmed, 89 N.J. Eq. 209; Rice v. Gould, 112 N.J. Eq. 379.
The trust company will be directed to refund to the complainant out of the corpus of the complainant's trust fund which is now in its possession, the amount paid by her as an inheritance tax, the sum of $8,887.54.
The complainant is entitled to interest on said amount from the date it was paid by her to the defendant trust company, but as this amount of $8,887.54 rightly should have been paid out of thecorpus of her trust estate, thus reducing it from $400,000 to $391,112.46, whereas income has been paid to her, or under the decree to be entered in accordance with this opinion will be directed to be paid to her, on the basis of her trust fund having a corpus of $400,000, she thus has, or in effect will receive under said decree, interest on that amount. For that reason and further because interest on that amount is properly chargeable against the defendant trust company as executor and cannot properly be charged against the corpus of the complainant's trust estate the income otherwise provided to be paid to her pursuant to said decree shall be deemed to include the interest due on said sum of $8,887.54.
The defendants Roy W. and Charles P. Gates and Pauline Gates Heely filed a counter-claim wherein they seek to compel the complainant to return, or repay, to the corpus of the trust, the income received by her from the trust fund, prior *Page 488b 
to January 2d 1931. The amount involved is approximately $6,000. They charge that complainant was not entitled to any income until one year had elapsed after the testator's death; that because of representations by complainant to Mr. Pond, president of the trust company, of a lack of funds to meet living expenses, they consented to have $200,000 of the trust set up on May 31st, 1930, which was before the expiration of one year from the date of the testator's death; that the counter-claimants' said consent was given because they relied upon said representations which the subsequently found to be untrue and false. It appears that the counter-claimants' consent was obtained after the complainant agreed to give them certain chattels bequeathed to her by decedent. However, the determination as to the complainant's title to the income herein, above announced, is dispositive of the demand in the counter-claim; and it does not seem necessary, under the circumstances, to further consider the issue thus raised. The counter-claim will be dismissed.
I shall advise an order to conform with conclusions above declared. *Page 489