KATIE TANNENBAUM, complainant,

*v.*

SEACOAST TRUST COMPANY OF ASBURY PARK, NEW JERSEY,
a corporation, et al., defendants.

[Decided April 9th, 1938.]

*Messrs. Patterson, Rhome & Morgan* and *Messrs. McCarter
& English,* for the exceptants.

*Messrs. Furst & Furst,* for Thomas A. Mathis, substituted trustee.

BUCHANAN, V. C.

The cause or proceeding pending in this court under the above title or caption, is the administration of a trust.

About January 1st, 1923, the Seacoast Trust Company of Asbury Park, undertook to, and did, issue and sell to investors its bonds or obligations designated as "Guaranteed First Mortgage Participation Bonds," in certain denominations, bearing interest at 5½%, the same being primary obligations of the Trust Co., both as to principal and interest. The payment of the principal and interest was to be, and was, secured by the deposit and pledge with trustees appointed by the Trust Co., of assets of the Trust Co. consisting of bonds and mortgages of the usual type given to secure a mortgage loan, —which bonds and mortgages had been made by various persons to the Trust Co.

The Trust Co. became insolvent on December 22d, 1931; was closed under an order of the commissioner of banking and insurance of the State of New Jersey, on January 2d, 1932; and the said commissioner entered upon the liquidation of its affairs. Because of this situation and insolvency, the Trust Co. defaulted on January 1st, 1932, in the payment of its obligations to the holders of the "participation bonds" aforesaid; and thereby there arose in such holders, or the said trustees on their behalf, the right to proceed against the said pledged assets, for the benefit of the said holders of the participation bonds.

The trustees of this trust fund of pledged securities immediately resigned (or attempted so to do) and ceased to function as such trustees. Thereupon, upon bill filed herein by the above-named complainant on behalf of all holders of the participation bonds, this court, under its trust jurisdiction, took over the administration of the trust and appointed Thomas A. Mathis, first as trustee *pendente lite,* and subsequently as substituted trustee in the place and stead of the former trustees, with all the powers granted to such former

trustees under the terms and conditions of the trust agreement which had been executed by the Trust Co., and with the further authority from this court to conserve, manage and liquidate the properties of the trust estate for the purpose of ultimate distribution to and among the persons entitled thereto.

The several persons who had theretofore from time to time acted as trustees of this trust had of course thereby incurred the duty and obligation to account for the trust assets which had come into their hands and for their acts in the administration thereof. No such accountings having been made by them, they were called upon to account in this proceeding and an order of reference was made herein whereby it was referred to one of the special masters of this court to take the accountings of the said several former trustees. The special master, after due hearing, filed his report, in and by which he finds and reports that each of said several trustees was derelict in his duty under the trust agreement, and is obligated to account to, and reimburse, the trust estate for the losses incurred as the result thereof.

Exceptions to this finding and report were jointly filed by all the respondent former trustees; and the issues raised by such exceptions are now before this court for determination.

The trust agreement,—the terms and provisions of which must be looked to for the ascertainment of the duties of the trustees and the basis for such liability, if any, as has been incurred by them,—provides:

That the Trust Co. will deposit with the trustees, (as security for the payment of principal and interest of the participation bonds to be issued by the Trust Co.) a fund or aggregation of bonds accompanied and secured by real estate mortgages.

Such mortgages shall be payable to the Trust Co. and shall be first liens upon New Jersey real estate.

Such mortgages "shall, in no case, be of an amount exceeding two-thirds of the value" of the mortgaged premises "as appraised by the appraisers of the Trust Co."

The Trust Co. shall keep on deposit with the trustees at all times a fund or pledge of such mortgages of a total face principal value equal to 110% of the principal face value of all outstanding participation bonds.

The Trust Co. at its option may deposit with the trustees, in lieu of bonds and mortgages, cash, or other bonds or security of a character and valuation approved by, and satisfactory to, the trustees.

The Trust Co. may from time to time withdraw any deposited bonds and mortgages and substitute others in their place, provided that there shall always be on deposit with the trustees a total aggregate of bonds and mortgages and other deposited securities sufficient to equal 110% of the face value of outstanding participation bonds.

The Trust Co. may receive from the obligors and mortgagors payments of principal and interest; but shall render each month to the trustees a statement showing the principal still due, and a full and correct statement of the condition and amount of the collateral so held by the trustees.

No participation bonds shall be issued or be valid unless certified by the trustees; the trustees shall certify such participation bonds at the request of the Trust Co., provided a sufficient amount of bonds and mortgages or other security shall have been deposited as hereinbefore mentioned.

In case of the death, inability or refusal to act of any trustee, the Trust Co. may appoint a trustee to fill the vacancy.

On default in the payment of principal or interest of any of the participation bonds, the trustees may sell the pledged bonds and mortgages and other securities and distribute the proceeds proportionately amongst the holders of the participation bonds.

The trustees shall have full power and authority to examine the books, papers and documents of the Trust Co. "to the end that they may be fully informed of the extent, value and management of the securities pledged with them as aforesaid."

The trustees shall not incur any liability under this agreement, "except for their own negligence or misconduct in keeping the securities entrusted to them."

There is no express provision in the trust agreement giving the trustees the right or duty to take any action in case the fund or aggregate of pledged securities falls below the required 110% in face value; nor in the event of any depreciation of the value of any mortgaged parcel, nor in the event of any general decline in the values of real estate.

At the time of the insolvency of the Trust Co. there were $299,000 (principal, face value) of participation bonds issued and outstanding; and the trustees had in their hands as security therefor, $357,500 (face value), mostly in real estate bonds and mortgages, (nearly $30,000 in excess of the required 110%),—all of which they delivered over to the substituted trustee.

The master finds and reports,—and it is not disputed on this hearing,—that at all times during the period of the trust there were on deposit with the trustees, bonds and mortgages or other security of the total aggregate *face* value required by the terms of the trust agreemnt. One contention of the substituted trustee was (and is),—and the master finds,—that certain of these securities were not proper to have been accepted or retained and dealt with by the trustees as a part of the trust fund in question,—or rather, as a part of the requisite 110%; and that others of these securities were dealt with and acted upon by the trustees, improperly, on a basis of excessive valuation.

The items objected to by the substituted trustee are as follows:

1. $10,000 bond and mortgage, W. J. Church to Trust Co.

2. $21,000 bond and mortgage, Arthur C. Steinbach to Trust Co.

3. $15,000 bond and mortgage, Arthur C. Steinbach to Trust Co.

4. $20,000 bond and mortgage, Arthur C. Steinbach to Trust Co.

5. $25,000 bond and mortgage, Sunset Ave. Holding Co. to Trust Co.

6. $50,000 bond and mortgage, Sunset Ave. Holding Co. to Trust Co.

7. $72,000 bonds made by Berkeley Carteret Hotel Co. secured by trust mortgage.

The first of these items was objected to on the ground that Church was an officer of the Trust Co. The master finds that such a mortgage loan from the Trust Co. to one of its officers was not illegal or invalid. Admittedly the appraisal on which it was made by the Trust Co. was at least 50% greater than the amount of the loan. The bond and mortgage therefore came within the express terms of the trust agreement. The master finds the objection not well founded; and the substituted trustee has filed no exceptions to the master's report.

The next five items were objected to on the ground that the Holding Co. was simply Steinbach in corporate form; that Steinbach was president and director of the Trust Co. which made these mortgage loans to him and was also one of the trustees of the trust fund at the time these bonds and mortgages were turned over to, and received by, the trustees as a part of the trust fund. Additional objection was made as to items 2 and 5, that the mortgages were on lands which were entirely vacant and unimproved and productive of no income; and as to item 6, that it was a very large mortgage on a very expensive residence.

Admittedly all five of these bonds and mortgages came literally within the requirements as expressed in the trust agreement. If they are to be deemed improper to have been received and retained and considered as a part of the 110% fund, it can only be on the grounds mentioned in the preceding paragraph, together with the further findings of fact made by the master in regard thereto.

The master finds that Steinbach as an individual applied to the Trust Co. for these loans to himself; and that as president and director of the Trust Co., he approved of, and was instrumental in, the making of those loans by the Trust Co. to himself as an individual; and was further a participant and instrumental in their being turned over to the trustees in substitution for other securities withdrawn or to secure the issue of additional participation bonds; and as trustee he joined in accepting them as a part of the trust fund; that he used his position as president of the Trust Co. and as

trustee of the trust fund, for his own personal advantage and was indirectly, if not directly, dealing with the trust securities for his own advantage.

The evidence (uncontradicted) fully substantiates these findings; and further shows by the testimony of the trustees themselves (or some of them) that all of the loans made by the Trust Co. on bond and mortgage were made with the intent and purpose of turning such bonds and mortgages over to the trustees in order for the Trust Co. to issue participation bonds against them; that all of the trustees were at all times directors of the Trust Co., and therefore of course had knowledge of all these facts.

Essentially, therefore, Steinbach as trustee was dealing with himself as an individual. When he, as trustee, accepted these bonds and mortgages as part of the trust assets securing the participation bonds, and certified participation bonds on the strength thereof, he was carrying out and completing an arrangement which was essentially the same as if he as trustee loaned funds of the trust to himself as an individual,—as if he as trustee invested funds of the trust in a bond and mortgage made by himself individually to himself as trustee. This was of course a breach of his duty, as trustee; and it was equally a breach of trust on the part of his two co-trustees who had knowledge of all these facts, and acquiesced and participated in the acceptance of these assets into the trust and the issuance of participation bonds against them.

It is contended on behalf of the trustees that these bonds and mortgages came within the express terms and provisions of the trust agreement (as being bonds and mortgages which were first liens on New Jersey real estate and not exceeding 60% of the appraised value); and that therefore under the terms of the trust agreement they not only had the right but the duty to accept them and certify against them.

Such a contention is unsound. It is a fundamental principle, founded on public policy, that a trustee may not purchase property for the trust from himself as an individual,— (and that is essentially what this transaction was),—and it is immaterial whether he acts in good faith or whether he

pays a fair consideration. And the rule is true whether the property purchased is owned by himself or by a firm or corporation in which he has a substantial interest. See *Re-Statement of the Law, Trusts, Vol. 1, p. 435, § 170, par. h.* "The law demands of trustees the utmost fidelity. It does not tolerate personal dealing with the trust estate." *Shanley* v. *Fidelity-Union Trust Co., 108 N. J. Eq. 564, at 565, 138 Atl. Rep. 388; Gates* v. *Plainfield Trust Co., 121 N. J. Eq. 460, at 484, 191 Atl. Rep. 304; aff'd 122 N. J. Eq. 366, 194 Atl. Rep. 65;* and it is immaterial that the trust estate suffers no harm or even may have been benefited. *Gates* v. *Plainfield Trust Co., supra, at p. 486.*

Whether or not such legal duty on the part of a trustee may be modified by an express exemption in that behalf in the trust instrument need not be considered,—for there is no such express provision in the instrument in question. Assuredly such legal duty will not be deemed modified by any thing less than an explicit provision or an absolutely necessary inference.

It should be said that there is neither contention nor indication that any of the trustees acted otherwise than in good faith. The whole difficulty that has arisen in this case rests for the most part, if not entirely, on the fact that the trustees were in fact serving, at one and the same time, interests that were in fact (even though not realized to be) adverse to each other. The trustees, (whose beneficiaries were the holders of the participation bonds), were at all times directors of the Trust Co. which was the debtor obligor on those bonds. As trustees they held assets pledged in trust as security for others, while at the same time they were directors of the corporation which owned the "equity of redemption." So far as concerns the two mortgages on vacant land and the large mortgage on the expensive residence,—it cannot be doubted that no one of them would have been accepted as security at any thing like its face value by any trustee who was solely concerned with the protection of his *cestuis,* unless after direction or authorization by a court decree. That some of the trustees in question had doubts as to the acceptance of

these mortgages appears by their own testimony. Being in a situation where they were acted upon by conflicting interests, they should have submitted the matter to the court, as pointed out in the *Shanley* case, *supra*.

The acceptance of these five bonds and mortgages into the trust assets did not *in itself* constitute a breach of trust, nor occasion any loss to the beneficiaries. An *addition* to the trust security could not injure the beneficiaries. But the use of these bonds and mortgages by including them in the computation of security on hand against which participation bonds were issued and certified, did constitute a breach of trust. The certification of additional participation bonds on the strength of these bonds and mortgages as proper security, or the permitting of the withdrawal of other bonds and mortgages so that the trust fund, exclusive of these five bonds and mortgages, was diminished below the amount required by the trust agreement,—either of these constituted a breach of trust.

It is no excuse or justification for the trustees that these bonds and mortgages came within the literal provisions of the trust agreement. It may be that if Steinbach had been an entirely outside party, the trustees could not have rejected them, or refused to certify participation bonds against them; but no court (except under unusual circumstances and for the protection of the *cestuis*) would have compelled trustees to accept securities in which one of their number was interested individually. As already stated, the law holds such a transaction illegal, because of public policy.

(It may be mentioned, as not being without some significance, that as to all five of these Steinbach mortgages, all of them had to be foreclosed and the mortgaged premises taken over by the trustee, who has not yet after five or six years been able to dispose of a single one of them, and will probably not realize over $5,000 for the total real estate covered by the $131,000 mortgages.)

Next as to the seventh item above mentioned,—the Berkeley Carteret Hotel bonds. The master correctly found that the trustees were justified in accepting these bonds into

the security pool and in certifying participation bonds against them; but he also found, and correctly so, that they were not justified in accepting them and dealing with them on the basis of their face value.

The trust agreement permitted the Trust Co. to deposit "other securities,"—securities other than the real estate bonds and mortgages specified as the principal and usual securities,— when the Trust Co. found it inconvenient to furnish sufficient securities of the latter kind; but it also provided (see the ninth paragraph of the agreement), that such "other securities" must be of a character approved by, and satisfactory, to the trustees, and *at a rate of valuation* * * * *approved by the said trustees."*

These hotel bonds were obviously not within the category of the real estate bonds and mortgages specified by the agreement as the usual security. They were not "accompanied by mortgages," &c., nor by any mortgage. They, together with many other similar bonds, were secured by a single trust mortgage, which was not, and could not legally be, deposited with these trustees. Neither were they "first liens" upon the mortgaged premises. Their lien was only *pari passu* with the lien of all the other similar bonds.

Consequently it was the duty of the trustees to fix a valuation on them at which they would be accepted and dealt with as part of the security pool pledged with the trustees. It does not appear that the trustees, either at the time these bonds were originally so pledged or at any other time, fixed any valuation on them. It does appear that the trustees did at all times act upon the assumption that these bonds should be regarded as having a value equal to their face value. It does not appear that they ever were at any time worth their face value; on the other hand it does not appear that they were not worth face value when originally accepted into the trust in February, 1927.

The master finds, however, and the finding is supported by the uncontradicted evidence, that their value subsequently depreciated,—that in 1929 they sold at prices between 95% and 82% of their face; in 1930 at between 82 and 60; in

1931 between 61 and 32; and in 1932 between 27 and 9. It is unquestionably the fact,—and indeed it is not attempted to be denied,—that the trustees, who were all directors of the Trust Co., knew of this depreciation in values; yet they did nothing whatever in regard thereto. They made no effort or even request to have the Trust Co. sell, or authorize the trustees to sell, so as to substitute the cash proceeds for the rapidly depreciating bonds in that time of continuing and increasing economic depression and falling market; they did not demand or even request additional securities from the Trust Co.; they did not refuse to certify additional participation bonds.

The master found that the average value of these 72 hotel bonds during 1930 was an aggregate of $51,000, and for 1931 was $33,840, and that those two sums for those respective years should be taken to be the fair value of those bonds as security in the hands of the trustees. No exception to such finding has been taken by either party; and notwithstanding the failure of the trustees to perform their duty to pass upon and fix the value themselves, it seems equitable, in determining the propriety of their conduct in dealing with the pledged securities, to allow them those values for those bonds as part of the security pledge in their hands.

These Berkeley Carteret bonds therefore do not come within the same category as the Steinbach bonds and mortgages,—as securities which should not have been utilized or considered at all by the trustees in computing the amount of valid security pledged with them for the issuance and protection of participation bonds of the Trust Co.; instead they come within the category of securities proper to be utilized and considered as above, but which in fact were utilized and considered by the trustees at improper and excessive valuations; and the master correctly so found. The other securities coming within this latter category are a number of bonds and mortgages which were utilized and considered by the trustees throughout all subsequent years down to the taking over of the trust by the substituted trustee as entitled to the same valuation at which they had originally been appraised and taken into the trust.

Inasmuch as certain legal issues raised in this hearing relate both to the Berkeley Carteret bonds and these last mentioned bonds and mortgages, it will be advisable to mention the facts as to these latter before taking up the legal questions.

At the time the trust assets were taken over by the trustee appointed by this court from the three trustees theretofore in office,—shortly after January 1st, 1932,—those assets consisted of the $72,000 (face value) of Berkeley Carteret Hotel bonds above mentioned, and 26 real estate bonds and mortgages of a total face value of $286,500: a total aggregate face value of $358,500. The then outstanding participation bonds secured by this pool of trust assets aggregated $299,000,— 110% of which equals $328,900. The trust assets on hand, therefore, at *face value,* not only equalled but exceeded the amount required under the provisions of the trust agreement.

(This $286,500 of real estate bonds and mortgages included the five Steinbach bonds and mortgages aggregating $131,000 hereinbefore referred to, and determined to be invalid securities for this trust. For the purposes of the present discussion, however, such invalidity is not taken into consideration.)

However, although the face value of these trust assets was $358,500, their actual value was far less. As mentioned above, $33,840 (instead of $72,000) is a very generous figure at which to place the actual value of the Berkeley Carteret bonds. Of the 26 real estate mortgages, five, aggregating $28,500, were subsequently collected in full from the mortgagors by the substituted trustee. Hence, although there is no evidence as to the value of the mortgaged premises covered by these five mortgages, it must be assumed in favor of the trustees that their respective values were such as to make the mortgages come within the requisite of being not over two-thirds of the appraised value of the premises. Nine others, aggregating $70,000 more, appear from the evidence to have been for not more than two-thirds of the 1931 values of the respective mortgaged premises. The remaining twelve, as shown by the evidence, were each for more than two-thirds of the 1931 values of the respective mortgaged premises; and these twelve aggregated $188,000.

The master does not specifically set forth the respective 1931 values of the several mortgaged premises, but the evidence does. These values were severally testified to by two disinterested real estate experts, whose qualifications were both proven and admitted and whose testimony as to these values was not contradicted,—with the sole exception of the premises comprising the Steinbach residence. These premises were comprised in two mortgages held in the trust,—one for $50,000 comprising the residence and lot 150 x 150, valued as of 1931 at $42,500, by the witnesses for the substituted trustee, and at $55,000 by the witness for the defendant trustees; and the other for $25,000 comprising an adjoining vacant lot 125 x 150 with similar valuations at $12,500 and $25,000, respectively. Considering facts brought out on the cross-examination of the witness for the defendant trustees,—such for instance as the fact that he gave the same value to the house in 1931 as its cost of erection 18 years earlier, and that he had not been inside the house for several years earlier, —and the further fact that the substituted trustee has not been able to get any offer whatever for either tract in the six or seven years subsequent to 1931, it is clear that there is ample basis,—and, to say the least, no injustice to the defendant trustees,—in accepting, as this court does, the figures given by the witnesses for the substituted trustee as the proven valuation of the several mortgaged premises in 1931.

(The master obviously makes an inadvertent misstatement in his report,—p. 16, top,—where he says "It is true that even with these lower valuations,"—the $417,300 aggregate of the Substituted Trustees' appraisals of the mortgaged premises as of 1931,—"the outstanding participation bonds secured by these mortgages and other securities were within the necessary ratio as called for by the agreement." The total aggregate of the appraisals of the mortgaged premises has nothing to do with the ratio required by the agreement between the face value of the mortgages and the outstanding bonds. For example, suppose there were $200,000 of outstanding bonds and the trust fund of securities comprised ten mortgages each for $10,000 and each comprising prem-

ises admittedly worth $50,000. The total aggregate appraised value of the mortgaged premises would be $500,000; but the total security value of the trust fund would be only $100,000. The trustees could not collect $50,000 on any of these mortgages; the utmost they could collect on each would be the $10,000 for which the bond and mortgage was made. That the statement was an inadvertence is shown by the fact that the master proceeds to call attention to divers individual mortgages which, under the 1931 values of the mortgaged premises, did not come within the requisite category of "two-thirds" mortgages, *i. e.,* mortgages for not over two-thirds of the respective values of the mortgaged premises.)

These last twelve mortgages were all mortgages of not over two-thirds of valuation, however, at the times they were respectively taken by the trustees, several years earlier; so that when accepted by the trustees, they were properly so accepted, under the terms of the trust agreement. That being the case, it would seem clear that, in equity, the Trust Co. was entitled to have them retained in the trust assets, but at a valuation of two-thirds of the respective currently depreciated values of the several mortgaged premises respectively covered by them,—and that the trustees would not be subject to charge or to criticism for so retaining them and acting with regard to them on that basis.

On that basis, as appears from the evidence, the trustees would have been entitled to consider and treat these twelve mortgages as having a pledge or security value, under the agreement, of $123,335. Adding this to the $28,500 of the mortgages collected in full, the $70,000 of adequately secured mortgages, and the $33,840 value of the hotel bonds, gives $255,675 as the total aggregate *real* value of the securities held by the trustees at the close of their operations in January, 1932,—instead of the *face* value of $358,500.

Under the trust agreement, $328,900 in securities was required as protection for the $299,000 participation bonds outstanding; and to look at it conversely $255,675 of securities were sufficient only for $232,430 of participation bonds.

The mere fact of this insufficiency of security at the time in

question is, of course, not enough in itself to establish liability or even improper or negligent conduct by the trustees. It further appears, however, that the three trustees who were in office January 1st, 1932, took office August 27th, 1931; that at the time they took office, substantially the same situation of insufficiency of security existed and that they knew it,—or are chargeable with such knowledge; that they made no effort whatever toward getting the Trust Co. to deposit additional security; that on the contrary they permitted the Trust Co. to withdraw some of the securities which were on deposit without obtaining cash or other securities of value equal to those withdrawn; and further than that they permitted the Trust Co. to issue additional participation bonds against the already insufficient security, and they themselves certified on these additional participation bonds that the Trust Co. had on deposit sufficient security for such additional bonds as well as the other outstanding bonds.

These three trustees took office at the end of August, 1931. The evidence shows that in September, 1931, the face value of the securities in the trust was $416,401.33; that these securities included all of the securities which were still on hand on January 1st, 1932, plus (obviously) $57,900 face value of other securities. The evidence does not show what these other $57,900 of securities were, so it must be assumed that their fair value as security was the same as their face value. The other $358,500 (face value) had an actual fair security value of $255,675 as has already been mentioned.

The evidence does not show that these trustees had the exact knowledge as to the actual fair value of the $358,500 face value of securities; but it does show that they should have had that knowledge and are chargeable with that knowledge. They all knew that these bonds and mortgages were accepted as proper under the trust agreement on the basis of appraisals of the mortgaged premises made at the times the mortgages were accepted; they all knew that real estate values had depreciated very considerably during the two years prior to their taking office and hence they knew that it was quite possible, if not indeed probable, that some of those

bonds and mortgages were no longer "two-thirds valuation" mortgages; they knew that no appraisals had been made of the respective mortgaged premises at any time subsequent to the times they had been accepted into the trust. They also knew that a period of severe depression existed, and that the Trust Co. (the obligor on the participation bonds) was in a very serious financial condition. It was their duty as trustees, under these circumstances, to have these mortgaged premises reappraised, so that they could know whether the securities for the participation bonds were sufficient under the terms of the trust agreement and act accordingly. (The defendants contend that they were not under such a duty. This issue will be discussed a little later.) They did not have such re-appraisals made, but since it was their duty they are chargeable with the knowledge they would have obtained if they had performed that duty,—namely that the actual value of these $358,500 (face value) mortgages was only $255,675 and the actual value of the entire pool of pledged securities (including the $57,900 above mentioned) was not $416,401 but in fact not over $313,575, and was therefore considerably less than the $331,320 (110%),—required by the agreement for the $301,200 participation bonds outstanding.

Since the pool of pledged securities had fallen below the amount required under the trust agreement, it was their duty to take steps to enforce the Trust Company's covenant in the agreement,—to bring and maintain the securities at 110% of the outstanding participation bonds. They took no such action. It does not appear, however, that if they had taken such action it would have been of any benefit to the holders of the participation bonds; it does not appear that the Trust Co. could have deposited further security if they had been so directed by a court decree; rather does the testimony indicate that the Trust Co. could not have done so.

But it was the duty of the trustees, in that situation, to see to it that so far as they could control it, no further depreciation or diminution in the security should occur,—that none of the securities in the trust fund should be withdrawn and

that no further participation bonds should be issued unless and until the security should be restored to the required 110%. The evidence shows, however, that between September, 1931, and January, 1932, they permitted the Trust Co. to withdraw $57,900 of securities, without substitution of any other required security and without any appreciable diminution (only $1,200) in the outstanding participation bonds. Further than that they certified and permitted the issuance by the Trust Co. of $3,000 of additional participation bonds, —which was obviously not only a breach of their trust duty toward the holders of the already issued participation bonds (by diminishing their proportionate share of the security pool which was already below even 100% of the outstanding participation bonds), but also a misrepresentation to the new purchasers that the security pool was adequate and sufficient under the terms of the trust agreement.

This brings us to that which is the real, main question at issue in this proceeding,—to wit, whether or not it was the duty of these trustees to have the several mortgaged premises and the Berkeley Carteret bonds appraised.

That such was their duty, in view of the factual situation hereinbefore mentioned (and which is not controverted), seems not open to argument, unless the duties of ordinary trustees of such a trust and in such circumstances were limited and lessened by express provisions in the trust agreement. Certainly it is ordinarily the duty of a trustee who holds assets in trust as security for others, to take such care and steps for the preservation of that security as the average prudent man would take as to his own property; and if the trustee has greater knowledge and skill than the average man, it is his duty to exercise care in accordance therewith. *A. L. I. Re-Statement of the Law, Trusts,* § *174; Gates* v. *Plainfield Trust Co., supra;* also the opinion of Mr. Justice Heher in *Ross* v. *Savings Investment & Trust Co., 123 N. J. Eq. 288, at 291, 197 Atl. Rep. 59.* (It is to be observed that although the court was equally divided in this last case, the division was on an entirely different issue.)

Can there be any doubt that the average prudent man,

owning a bond secured by real estate mortgage, in those times of economic depression, continued depreciation in values of real estate and failing markets (all of them admittedly known to and realized by him) and with the knowledge that the financial responsibility of the obligor on the bond was very questionable,—(the trustees, as directors of the Trust Co. had this knowledge),—would have taken steps to ascertain the *then* value of the mortgaged premises? Would, or *could*, any ordinarily intelligent man have deluded himself with the notion that because the mortgaged premises were worth such and such an amount two or three years earlier, they would still be worth approximately the same two or three years later, under those greatly changed conditions? Yet these trustees not only did not have the properties appraised,—they did not even make any investigation as to whether they had been kept in adequate repair or whether taxes were in arrears,—or even whether the houses on the mortgaged premises were still in existence. These trustees, as bank directors, were above the average in knowledge and skill in such matters; and moreover they had the greater duty to examine the trust property because they were just taking office and taking over the trust assets. *Bogert on Trusts, vol. 3, p. 2058; Gales v. Plainfield Trust Co., supra, at p. 477.*

And of course the same ordinary prudence which would prompt an ascertainment of the value of mortgaged premises under those circumstances, would likewise prompt an ascertainment of the then present value of other securities such as the hotel bonds.

That such trustees would ordinarily be under this duty is really not controverted by the exceptants,—at any rate, not seriously. The position they take is that under the terms of the trust agreement they were exempted from any such duty and absolved from any and all responsibility in connection therewith; that the agreement was in reality not a trust agreement but a mere deposit agreement; that under it they were not trustees of an active trust, but mere custodians and bailees of the deposited securities; and that even if they had had or obtained the knowledge as to the actual depreciated

values, there was nothing which they could do about it for the benefit or protection of their *cestuis*.

A careful consideration of the provisions of that trust instrument leads to the conclusion that such a contention is untenable,—especially under all the circumstances.

The trust agreement recites the purpose of the Trust Co. to issue participation bonds and to secure them by the deposit with the trustees of real estate bonds and mortgages. The Trust Co. agrees (item Second) with the trustees *"as trustees for the holders"* of such participation bonds, that it will deposit, and *keep at all times* on deposit, with the trustees such bonds and mortgages in an aggregate face value equal to 110% of the aggregate participation bonds outstanding, none of which mortgages shall be for an amount exceeding two-thirds of the appraised value of the mortgaged premises; with provisions (item Third) that the Trust Co. may withdraw any bonds and mortgages and substitute others, provided that there shall always be left with the trustees *sufficient* bonds and mortgages (and other securities) to equal 110% of the outstanding participation bonds.

The Trust Co. is permitted (item Third) to receive payments from the obligors-mortgagors,—but shall give the trustees monthly a written statement of the amount due on the bonds and mortgages and a full and correct statement *of the condition* and amount of the collateral held by the trustees. "The character and value" of the mortgage loans and other securities "are not known to the Trustees" except as appears by the deposited instruments and accompanying papers, and by the certifying statements of the Trust Co. (item Fourth).

The trustees shall certify (item Sixth) participation bonds, at the request of the Trust Co. *provided* a "sufficient amount" of bonds and mortgages or other security shall have been deposited with them; but (item Fifth) no participation bond shall be issued or valid unless endorsed with a certificate by the trustees. By that certificate, (dated), the trustees certify that the Trust Co. has deposited, and the trustees then hold, bonds and mortgages and other securities as provided in the agreement, amounting to at least 110% of the participation bonds already certified.

In the event of the death, &c., of any trustee, the Trust Co. is empowered to fill the vacancy (item Seventh).

In event of default by the Trust Co. in principal or interest of any participation bond, the trustees (item Eighth) are empowered to sell the pledged securities or collect on them by suit or otherwise, and pay the participation bondholders ratably.

The Trust Co. is empowered (item Ninth) to deposit with the trustees, in lieu of bonds and mortgages, cash or other securities of a character "approved by and satisfactory to the trustees," and at a valuation "approved by the trustees," "to the end that the securities in the hands of the trustees may at all times be sufficient and ample for the *complete protection*" of the holders of the participation bonds.

The trustees are given (item Tenth) full power and authority at all times to examine the books and papers of the Trust Co. in relation to the participation bonds or the mortgage loans, "to the end that they may be fully informed of the *extent, value and management*" of the pledged securities.

Item Twelfth refers to the forms of participation bond and certificate which are annexed to the agreement. That participation bond provides (item "(3)") that the trustees, on default by the Trust Co. in principal or interest, "shall act as agents" for the participation bondholders, "to collect principal and interest" of the pledged securities; receive and adjust fire losses; determine as to enforcement of provisions of pledged securities; and to effect extension, or anticipation, of time of payment of such securities.

(None of the italicization above appears in the agreement.)

Item Eleventh provides that the trustees need not keep accounts of "the said bonds," but such accounts shall be kept for them by the Trust Co.; "nor shall they (the trustees) incur any liability under this agreement, except for their own negligence, or misconduct, in keeping the securities entrusted to them."

Omitting, for the moment, consideration of the effect of the provisions of item Eleventh, purporting to limit liability,—it is perfectly clear that this agreement is not a mere

deposit agreement imposing on the trustees nothing more than the mere passive duty of the safe-keeping of deposited securities. The agreement is referred to as a "deposit agreement," but the mere name is of course not controlling; and moreover the agreement specifies the trustees as "trustees for the holders" of the participation bonds,—and the trustees signed it specifically as "trustees."

Looking further, however, to the other contents and provisions of the instrument,—it cannot be denied that they impose active trust duties on the trustees. The participation bond,—annexed to and hence by implication accepted and agreed to by the trustees, provides that in case of default, the trustees *shall become the agents* of the participation bondholders, to collect, liquidate and distribute the trust assets, as the trust agreement gives them power to do. Moreover, they had the active duty to see to it, before they issue any certificate on any participation bond, that the bonds and mortgages deposited with them are of the character and amount, (at least, as shown by the documents themselves and the accompanying appraisals and other papers), specified in the agreement,—to see to it that such bonds and mortgages are accompanied by papers showing on their face that the mortgages are first liens on New Jersey real estate and that the mortgage premises have been appraised and at what figures; also the active duty, as to securities other than bonds secured by real estate mortgages, of exercising their own knowledge, skill and judgment in ascertaining and determining the fair value thereof.

In addition to these express duties, it also seems clear that by natural implication (aside from the limitation clause referred to) there are other active duties imposed. Being trustees, for the bondholders; and, as such, being the covenantees of the covenants made by the Trust Co., and the holders of the powers given them by the Trust Co., for the benefit and protection of those bondholders, it was the duty of the trustees, for the benefit and protection of their *cestuis,* to see to it that those covenants by the Trust Co. were kept and performed, or enforced. This clearly applies to the matters

of obtaining the written monthly statements from the Trust Co. as to the amounts due on the deposited bonds and mortgages and the full and correct statements by the Trust Co. of the *condition and amount* of the securities held by the trustees; also obtaining statements of account from the Trust Co. for moneys received for fire losses; also the examination, from time to time, of the books and papers of the Trust Co. relating to the participation bonds and to the securities, "to the end that they (the trustees) may be *fully informed* of the *extent, value and management* of the pledged securities.

The obligations of a trustee are by no means necessarily confined to those specifically or inferentially contained in the trust instrument. There are certain general obligations imposed upon a trustee by law, even if they be not set forth in the trust instrument,—such as the obligation not to deal with himself as an individual with regard to the trust assets; the obligation to exercise good faith toward his beneficiary; and the obligation to use at least the same care and prudence for the preservation of the trust assets that he would as to his own assets. They were not required (at least under ordinary circumstances) to have their own appraisals of the several mortgaged premises, but were authorized to rely and act on the appraisals made by the Trust Company's appraisers. But this trust agreement nowhere says, either expressly or by implication, that these trustees are required to act on the basis or assumption that mortgages which, at the time they are deposited in the trust, are proper security as shown by the then appraisals, will and do continue to be proper security *in the same amount,* notwithstanding the lapse of one or more years of time and the utter absence of any subsequent appraisals by the Trust Co. or the absence of the required *full* statements from the Trust Co., as to the *condition and amount* of the pledged securities. Assuredly the provision that "The character and value of the mortgage loans and other securities deposited * * * as security * * * are not known to the trustees except as may appear by the papers accompanying the loans and as certified by the Trust Co., and on which basis the said trustees will make their certificates," is not so to be interpreted.

These trustees, especially being directors of a Trust Co., knew that mortgaged premises were likely to deteriorate in value from year to year, from one or more of various causes,—unpaid taxes, not being kept in proper repair, change of condition, and character of the location, general financial condition and the like. In the present instance these trustees knew that no subsequent appraisals had been made; that no reports had been furnished by the Trust Co. as to the "condition and amount" of the pledged securities; they knew the serious financial condition of the obligor on the participation bonds; they knew the general financial condition and the decline in real estate values generally; and they knew at least that in all human probability, *some,* at least, of the mortgaged premises were no longer of sufficient value to make the bonds and mortgages proper security to the amount of their face value; and they actually knew that the value of the hotel bonds had fallen far below their value when taken into the trust.

Under these circumstances it is unthinkable that it could be held as matter of law, that the trustees were either required or permitted, under the provisions of the trust agreement, to assume, or rely or act upon the basis or assumption that the mortgaged premises and hotel bonds were still of the same value as the values at which they were appraised when they were taken into the trust,—that they could, without violating their duty to the *cestuis,* either certify additional participation bonds, or permit the withdrawal by the Trust Co. of any pledged securities except in exchange for cash or substituted security equal in value to that which was withdrawn. It is inconceivable that these trustees would have so acted, or would have had any such view, if they had been disinterested, "third party" trustees,—not connected with and interested in the Trust Co.

Such a holding, or such a view, if carried to its logical conclusion would necessarily amount to this,—that even if the trustees had actual knowledge that the premises comprised in a $50,000 bond and mortgage (which was proper security for that amount when taken into the trust), had been there-

after completely washed away by the sea,—land, buildings and all,—they could nevertheless proceed and continue to act as though that $50,000 of security was still in their hands, simply because they still had on deposit the bond and mortgage and a proper appraisal and certificate of title.

All that has been thus far said would apply to trustees who were disinterested third parties,—not connected with the Trust Co. Obviously it applies with even greater force to these trustees who were directors of the Trust Co.

If these trustees had been disinterested third parties,—not connected with the Trust Co.,—it would have been their duty, if they had any doubt because of apparent doubtful provisions or ambiguities in the trust agreement, to have applied to the court for instructions, or at least to get legal advice from competent counsel, and meanwhile to refrain from acting as they did. Still more was such the duty of these trustees, who were directors of the Trust Co.,—a party whose interests were in direct conflict with those of the participation bondholders; yet they did neither of these things. Of course, (notwithstanding they did it from praiseworthy motives), neither these directors nor any other directors of the Trust Co., should have undertaken to act as the trustees,—especially under the then existing circumstances and situation. They should have had disinterested trustees or trustee appointed.

We come now to the consideration of the "limitation of liability" clause.

That clause provides the trustees shall not incur any liability under the agreement, except for their own negligence, or misconduct, "in keeping the securities entrusted to them." Obviously that is susceptible of the literal interpretation that they are not to be liable for any damage or injury occasioned to the trust assets or the beneficiaries by any misconduct or breach of trust on their part, no matter how glaring such misconduct might be nor how great the damage resulting therefrom,—except only misconduct in relation to the mere physical safe-keeping of the bonds, mortgages and accompanying papers which were actually deposited with them. Under such an interpretation, the sole duty, for the violation of

which they could be held to account, would be the duty of acting as a sort of human safe deposit box; and that is the position taken, and the contention made, by these defendants in this accounting proceeding:—that no matter what other trust duties imposed upon them by this agreement they may have violated, the clause in question absolves and exempts them from any financial responsibility for whatever damage resulted to the beneficiaries therefrom.

Such an interpretation would necessarily mean this, *inter alia,*—that notwithstanding no bond is to be issued or to be valid unless it be certified thereon by the trustees that sufficient and proper securities for the protection of such bond and all others outstanding, have been and are deposited with the trustees, nevertheless if the trustees should certify, and permit or participate in the issue to themselves of $100,000 in participation bonds when there were only $50,000 in collateral securities deposited with them and $50,000 of participation bonds had already been issued against them, and should sell and transfer to innocent purchasers the $100,000 of participation bonds thus wrongfully issued to themselves, and the holders of the participation bonds could not obtain payment from the Trust Co.,—the trustees though guilty of such a glaring breach of trust could not be held financially to account therefor because their misconduct was not in relation to the safe-keeping of the securities which had been deposited with them. (They would of course be liable to the purchasers of the $100,000 of bonds, but on the ground of fraudulent misrepresentation,—not for breach of trust.)

It is impossible to conceive that such could have been the intent of any of the parties to the agreement,—unless that agreement was designed by the parties as a scheme to entrap and defraud investors; there is no proof of this latter, and it is not to be presumed.

Among the ordinary definitions of "keep" are,—"to take care of," and "to preserve from danger, harm or loss." It must be deemed therefore that this clause should properly be construed, according to the true intent of the parties, as referring not merely to the physical safe-keeping of the tan-

gible instruments, but to the keeping and preservation in other respects, of all the security provided in and by the trust agreement for the benefit and protection of the bond-holders,—including the proper exercise of the trust powers therein given to the trustees for that purpose.

Provisions limiting or relieving trustees from liability are always strictly construed against the trustees. *A. L. I. Re-Statement of the Law, Trusts, vol. 1,* § *222, (a), p. 632, *Tuttle* v. *Gilmore, 36 N. J. Eq. 617, at 622.* "In construing such a clause, the meaning to be attributed to it should be consistent with the purpose and object of the trust."

It is perfectly clear from a reading of that instrument that its general purpose and object was to give to the purchasers of the participation bonds,—to give to them by the medium of the trustees acting for them and on their behalf for their benefit and protection,—a trust fund of adequate and sufficient security, beyond and in addition to the financial responsibility of the Trust Co. itself, for the payment of their bonds. And there are a number of particular clauses in the instrument emphasizing this purpose. For instance, the provision requiring the trustees themselves to determine the value of securities other than real estate bonds and mortgages, "to the end that the security in the hands of the trustees may *at all times* be *sufficient and ample* for the *complete protection*" of the bondholders. Also the clause giving the trustees full power and authority at all times to examine the books and papers of the Trust Co. "to the end that they may be *fully informed* of the extent, *value* and management of the securities" pledged with them; and the clause requiring the Trust Co. to give them monthly a written statement of the *"condition and amount* of the collateral" held by the trustees.

We may admit for the sake of argument that it never was and never became the duty of the trustees, even in August, 1931, to make appraisals of the mortgaged premises themselves; but assuredly it was their duty, by irresistible inference under the terms of this instrument, to see to it that, at least in accordance with the statements and records of the

Trust Co.,—the security *was* ample and sufficient for the protection of the bondholders,—to see to it that the Trust Co. did perform its covenants to give them full and correct statements monthly of the condition and amount of the collateral. These covenants and powers were made to, and given to, the trustees for the adequate protection of the bondholders. By necessary implication it was a part of their trust duty to exercise those powers and enforce those covenants, for the protection of those beneficiaries. Clearly such was the purpose and intent; there was no other object or purpose in giving them those powers and rights. And there is no clause or provision in the instrument expressly stating that the trustees *should not be under such duty.* To violate a trust obligation which actually exists,—whether that trust duty appears in express terms or by necessary implication,—is of course a breach of trust. *Cf. Conover* v. *Guarantee Trust Co., 88 N. J. Eq. 450, 102 Atl. Rep. 844.*

There are also other factors which are illuminating in determining the proper interpretation of this clause. It will be remembered that the instrument as a whole seeks to relieve the trustees of the details of appraisals, keeping accounts, and the like, and imposes those duties on the Trust Co.; and the first part of the very paragraph in question, item Eleventh, provides that the trustees shall not be held liable for the keeping of any accounts of the said bonds, (which would of course ordinarily be a duty of such trustees), "but the same shall be kept for them, under their direction, by the officers of the Trust Co.;" and then the paragraph goes on,—"nor shall they (the trustees) incur any liability under this agreement except for their *own* negligence or misconduct in keeping the securities, &c."

The word *"own"* is not italicized in the original, but it seems clear that it *is* emphasized and italicized by the very force of the language of that paragraph as a whole; and that what the last clause was intended to mean and express was, not that their liability should be limited to the duty of mere safekeeping,—but that the trustees should not be liable for the negligence or misconduct of the officers of the Trust Co.

or others,—that the trustees should be liable only for *their own* negligence or misconduct in and about the performance of their duties to keep and preserve,—not merely physically, but from risk, danger or loss,—the security entrusted to them for the benefit and protection of the bondholders.

Still another consideration to be borne in mind is this,—that these trustees were, all of them, in the beginning as well as at the end, directors of the Trust Co. (and some of them officers). The Trust Co. was engaging in the business, for its own profit, of selling the participation bonds. To that end it desired to obtain purchasers thereof, and it was with that object that it sought to give to such prospective purchasers assurance of complete security by and under this trust plan and agreement, so that they would understand and believe that they were protected not merely by the financial responsibility of the Trust Co. and probability of good management and good faith on its part, but further by an ample fund of adequate security held not by the Trust Co., but in the separate custody and control of trustees for their protection,—trustees who were outstanding men in the community.

It must be assumed that this agreement, therefore, was intended honestly and in good faith, to acomplish that purpose and result,—that it was *not* cunningly contrived to mislead and entrap the unwary by giving an appearance of that protection while actually giving no such protection. That being so, and these trustees being directors of, and with personal interests in, the Trust Co., and having full knowledge and participation in the intent and purpose of the Trust Co. to give such protection to the investors,—still less can they be permitted now to claim that the trust agreement is not to be construed as giving the protection that was intended. Still more, and to the utmost reasonable degree, must this trust instrument be interpreted, as between the trustees and the bondholders, most favorably to the latter and against the former. For this court to do otherwise would be for it to do that which would in effect accomplish a fraud upon the investors; whereas its particular province is to correct abuses of confidence. *Peppler* v. *Roffe, 122 N. J. Eq. 510, at 515.*

Moreover, it would seem that the clause in question even according thereto the effect of limiting liability except for derelictions in the "keeping" of the physical securities would not exculpate these trustees in the instant case. As has been heretofore set forth, the thing by which these trustees who took office in August, 1931, incurred the chief liability, was their negligence in permitting the Trust Co. improperly to withdraw from the trustees $57,900 of the securities which the trustees were under the duty to "keep" in their possession.

Next, as to the liability of the trustees Fischer, Steinbach and Calvert,—who held office prior to the last three. Steinbach was a trustee from the beginning; Fischer was appointed October 2d, 1925; and Calvert was appointed March 2d, 1931, to take the place of Berry who had died.

In February, 1928, the trust fund reached its highest aggregate with a face value of $442,600. There were then $359,600 in participation bonds outstanding. This $442,600 included $91,000 of the so-called "Steinbach mortgages" and also the $72,000 of hotel bonds. For the reasons heretofore shown the Steinbach mortgages should not have been computed at all as a part of the 110% security,—and the hotel bonds ought not to have been computed at full face value but at not over 95. This would make the ratio of securities,—at the legally available values thereof,—to outstanding bonds 96½% instead of the required 110%.

The trustees therefore were under the duty not only to certify no additional bonds until sufficient additional security had been deposited, but also to permit no diminution of security,—no withdrawal of any securities except in exchange for cash or other security of value equal to that withdrawn,—until sufficient participation bonds had been paid off to bring the security ratio up to the required 110%.

From $359,600 in February, 1928, the outstanding participation bonds dropped to $305,900 in August, 1931; at which time the face value of the security fund was $403,000. From this $403,000, however, should be deducted the $91,000 of "Steinbach mortgages" above, $40,000 more for two additional "Steinbach mortgages" deposited in the meantime, and

$38,160 for the difference between the $72,000 face value of the hotel bonds and their then value of $33,840 as found by the master,—an aggregate deduction of $169,160. This brings the "legal" value of the securities down to $233,830; and makes the ratio of security to outstanding bonds 76½%. (Doubtless also at that date some depreciation had already occurred in the "legal" value of some of the otherwise valid real estate bonds and mortgages,—as pointed out earlier herein,—but the evidence before the master is not sufficient to make any finding in that respect.)

When the Trust Co. closed and the court took over the trust, the outstanding bonds were $299,000, and the face value of the securities was $358,500. Making the similar deduction from this latter sum (for the Steinbach mortgages and hotel bonds) brings the "legal" value down to $189,340; and deducting the depreciation in the otherwise valid real estate bonds and mortgages, earlier discussed herein, brings it further down to $179,000,—and brings the ratio of security to outstanding bonds down to a trifle less than 60%.

The holders of the $299,000 bonds left unpaid had thus on January 1st, 1932, valid security to the extent of only 60% of their bonds, whereas in February, 1928, it had been 96½%, and in August, 1931, it had been 76½%. For the 16½% decrease between August, 1931, and January 1st, 1932, Fischer, Steinbach and Calvert were not responsible; they were not in office. Ackerman, Kinmonth and Jones were responsible for $57,900 decrease in security during this last period.

Fischer and Steinbach were, however, responsible for the 20% decrease between February, 1928, and August, 1931,— which amounts in dollars and cents to $59,800. Calvert was not responsible for *all* this decrease, because he took office only on March 2d, 1931. At that time the ratio of valid securities to outstanding bonds was 80%; so that during his short period in office the security had been permitted to be diminished only by 3½%, amounting to $10,465. For this portion of the $59,800 he is equally responsible with Fischer and Steinbach. (He admits he made no examination of the securities even when he took office.)

The basis of this liability is that these unpaid bondholders were entitled under the trust to have the security fund maintained in "valid" securities, to an amount equal to 110% of their bonds; the fund was wasted and decreased in the amounts stated by the withdrawal of securities from the fund when it was already not only below 110% but below 100%; that the trustees wrongfully permitted and thus participated in this waste and diminution of the fund, and hence became and are under the duty to restore the security thus wrongfully withdrawn.

That liability of course accrued at and before the closing of the Trust Co. on January 1st, 1932. They are, therefore, also liable for interest from that date, on the amounts specified. The beneficiaries of the fund had the right to have the fund maintained,—and the right to have any abstraction or waste immediately replaced or made good. Those concerned in the abstraction or waste have no right to say that they are not required to repay until the liquidation of the remaining securities has been completed and ascertainment thereby definitely made of the exact amount still necessary to pay the bondholders in full. Their duty is immediate repayment; and then if prior to final liquidation of all the security, the bondholders shall have received payment in full, any remaining unliquidated securities can be turned over to the trustees. (The receiver of the defunct Trust Co. would have no claim to them, because it was the Trust Co. which actually obtained the securities wrongfully withdrawn.)

Moreover there seems very little, if any, possibility that there will be realized for the bondholders, even with the payment by the trustees of their liabilities in full, with interest, a sum sufficient to pay the full amount due on the bonds with interest. It must be remembered that this trust fund was security for the payment of interest as well as principal of the bonds and that interest in respect of these bonds has been accruing all this time; whereas the total gross proceeds from the securities received by the trustee have amounted only to approximately $189,000, as appears by the records in the cause, and the estimated value of all the assets still remaining is only some $16,000 or $17,000.

It is concluded that the substituted trustee is entitled to decree for immediate payment to him by the defendants Ackerman, Kinmonth and Jones, jointly and severally, of $57,900 and interest from January 1st, 1932; by the defendants Fischer, Steinbach and Calvert, jointly and severally, of $10,465 and interest from the same date; and by the defendants Fischer and Steinbach, jointly and severally of $49,335 additional, with interest from the same date.

The liability of Ackerman, Kinmonth and Jones to the substituted trustee in respect of the $3,000 additional participation bonds wrongfully certified and issued by them when the trust fund was insufficient for the already existing participation bondholders, rests upon a somewhat different footing. By that conduct they added $3,000 more to those entitled to the benefit of the security and deprived the pre-existing holders of the ability to have that much of the security applied to the benefit of their claims. If, however, the bondholders be paid in full, no loss will have been occasioned to them by the acts in question. Although it seems certain that they will not be paid in full, nevertheless that cannot strictly be determined until all the security has been exhausted,—and hence, until that time, decree in this respect would be premature.