In the Matter of the Estate of LILLIAN STUPACK, Infant.*

Surrogate's Court, Kings County, March 14, 1935.

* See *contra*, *Matter of Nix* (154 Misc. 61).   See, also, *Matter of Alexander* (152 id. 354).

*Thomas E. White*, for the Fidelity and Deposit Company of Maryland, surety on bond of general guardian.

*Cyrus S. Jullien*, special guardian for Lillian Stupack, infant.

*Zvirin & Lippner*, for Fannie Stupack, petitioner.

WINGATE, S. The present proceeding is one of accounting by the general guardian of an infant, appointed by this court on August 2, 1929. The liability, if any, of her surety, who desires to withdraw, is also involved. The principal fund of the trust is represented by a balance of $40.43 in the Kings Highway Savings Bank, a credit balance of $388.52 in the Bank of United States, now in liquidation, and twenty-one series F-1 certificates of New York Title and Mortgage Company in varying amounts having an aggregate face value of $27,500. According to the allegations of the account, the present market value of these certificates aggregates $7,500, indicating a present admitted loss of principal on this account of $20,000.

The special guardian, appointed for the protection of the interests of the infant, has objected to the account " upon the ground that said certificates do not represent investments of the character permitted for the investment of said infant's funds under section 85 of the Domestic Relations Law, section 111 of the Decedent Estate Law, section 21 of the Personal Property Law, and are, therefore, improper and illegal for investments of said funds." He also objects on the ground that " the investment of practically the entire estate of said infant in this single form of security was improvident and unwarranted."

With the second objection this court has frequently expressed its lack of sympathy (*Matter of Froelich*, 150 Misc. 371, 375; *Matter of Adriance*, 145 id. 345, 352), and were this the only fault found with the actions of the accountant, it could see no reason for a reversal of its previous attitude, which a surcharge would involve.

The question squarely presented for determination, therefore, is as to whether the series F-1 certificates of the New York Title and Mortgage Company were legal investments for the trust funds of this infant. If they were, the fiduciary must be exonerated from liability; if they were not, her placing of the funds of her

trust therein subjected her to an implied contract of guaranty that the estate would not be involved in loss as a result of her act. (*Matter of Adriance,* 145 Misc. 345, 349; *Matter of McCafferty,* 147 id. 179, 199; *Matter of Ayvazian,* 153 id. 467, 477.) Loss has been demonstrated; indeed, substantial loss is alleged by the accountant, wherefore, the sole question for decision is as to whether the particular form of investment selected was within the protection of legislative authority.

Section 85 of the Domestic Relations Law, at the time of the purchase of the securities in question, provided, and still provides, that " a guardian holding trust funds for investment has the powers provided by section one hundred and eleven of the decedent estate law for an executor or administrator."

At the time of the acquisition of these securities, section 111 of the Decedent Estate Law, so far as presently material, read: " An executor, * * * or other person holding trust funds for investment may invest the same * * * in bonds and mortgages on unincumbered real property in this state worth fifty per centum more than the amount loaned thereon, and in shares or parts of such bonds and mortgages, provided that any share or part of such bond and mortgage so held shall not be subordinate to any other shares thereof and shall not be subject to any prior interest therein, and provided further that bonds and mortgages in parts of which any fiduciary may invest trust funds together with any guaranties of payment, insurance policies and other instruments and evidences of title relating thereto shall be held for the benefit of such fiduciary and of any other persons interested in such bonds or mortgages by a trust company, a bank authorized to conduct a trust department or title guaranty corporation organized under the laws of this state, or a national bank located in this state and duly authorized to act as a trustee therein, and that a certificate setting forth that such corporation holds such instruments for the benefit of such fiduciary and of any other persons who may be interested in such bond and mortgage among whom the corporation holding such instruments may be included, be executed by such corporation and delivered to each person who becomes interested in such bond and mortgage."

The amendments to this statute effected by chapter 623 of the Laws of 1932, chapters 321 and 779 of the Laws of 1933 and chapter 838 of the Laws of 1934 have made merely immaterial changes of phraseology in the portions of the section quoted.

The question for present determination is as to whether the investments made by the present accountant conform to the statutory requirements indicated.

The genesis of the New York Title and Mortgage Company class " F-1 " certificates is found in an agreement dated February 21, 1927, between this company and its subsidiary, the American Trust Company. This instrument, while burdened with the verbosity which appears prevalent in documents of this character, provided, in substance, that the title company should deposit with the trust company an unspecified number of bonds and first lien mortgages on improved real property in New York city, together with appraisals showing the values of the respective properties incumbered to be at least fifty per cent greater than the amounts of the mortgages secured thereby, and that from time to time, as requested by specified officers of the title company, the trust company would issue " Certificates of Interest " in a form specified in the agreement, to a total not exceeding " the total principal sum secured to be paid by the deposited bonds and mortgages then held by the " trust company " and owing thereon."

The instrument further provides that the title company " guarantees to the registered holders of the certificates issued hereunder, payment of the principal sums thereby secured, ten years after the first interest day provided for herein, unless previously paid." Acceleration of payment of principal is provided for in four instances, namely, after three years, on sixty days' notice by either the title company or the certificate holder, on the death of a certificate holder and request by his legal representatives, and, if the holder is a fiduciary, at any time when distribution is required.

The title company is " appointed irrevocably the agent " of all certificate holders, "(a) to collect the interest and principal of the deposited bonds and mortgages, and to satisfy and discharge the same in its own name; * * * (c) to decide when and how to enforce any provision of the said bonds and mortgages, and in its own name to enforce the same, and in all respects to pursue any remedies which any owner of said bonds and mortgages might pursue; to receive payment of principal or interest thereon in advance; (d) to withdraw from deposit deposited bonds and mortgages and to substitute other first mortgages * * * in their place, to such an amount that the principal sum of all deposited bonds and mortgages shall never be less than the principal sum of the outstanding certificates of interest; * * * any bonds and mortgages so withdrawn shall thereby be released and discharged to all intents and purposes, of and from all right, title and interest on the part of the holders of any certificates of interest which at the time may be outstanding or which shall be issued

thereafter, and the bonds and mortgages deposited in their place shall thereby become subject to the terms of this agreement."

The agreement further provides that " 6. Whenever, and as often as, the aggregate of the principal sums secured to be paid by the deposited bonds and mortgages and owing thereon shall exceed the aggregate of the amount of certificates of interest outstanding under this agreement, the Title and Mortgage Company shall be entitled to, and out of the collections of principal and interest on the deposited bonds and mortgages shall be at liberty to retain, the excess of such principal over the amount of such certificates, together with the entire interest on such excess; * * * 10. * * * It shall be no part of the duties of the Depositary to make investigation concerning, nor shall it be responsible for, the validity, nature or actual value of the bonds and mortgages so assigned to it, nor for the accuracy of the appraisals."

The certificates issued pursuant to this agreement, and which are the investments presently in issue in this proceeding, contained a considerable portion of the matter hereinbefore quoted. Printed in the small type employed, it occupied a space approximately six and a quarter inches square, but when typewritten in the usual manner on legal sheets, it fills about four and a half pages.

Whereas the certificate purports to sell and assign to the registered holder " an undivided coordinate share of the same amount in the principal sum secured by the bonds and mortgages or in the moneys secured to the Company in the bonds and mortgages deposited, or which may hereafter be deposited," the real gist of the obligation is contained in the agreement that " the Company guarantees to the registered holder hereof payment of the principal sum hereby secured, ten years after the first interest day provided for herein (unless previously paid)."

This thought is further borne out in three of the four acceleration clauses which provide that " the Company * * * shall have the right *to pay* to the registered holder hereof the principal sum and interest;" that the " holder * * * shall have the right * * * to require the *payment* of the principal sum and interest;" and that " when the holder of this certificate is an executor " or other fiduciary, " the certificate shall be *payable* on demand."

Four former officers or employees of the New York Title and Mortgage Company testified respecting the methods of dealings by the company with the bonds and mortgages deposited as security for the certificates. All appraisals of values of the properties underlying the mortgages were made in the appraisal departments of the title company, and the mortgages when turned over to the trust company were usually deposited on the basis of the values originally

assigned to them on the placing of the mortgage. All mortgages held by the title company, in which were included indiscriminately the mortgages which had been deposited with the trust company as security for the certificate issue, were listed for sale in the portfolio of the sales department of the title company, and if a purchaser could be found for any deposited mortgage, it was withdrawn and another of approximately equal face value substituted.

In view of this demonstration, the words of two of the former vice-presidents of the title company respecting the nature of the entire deposit transaction appear particularly apt. At page 47 of the record the following appears: " These appraisals were made and then from time to time as they were used as *collateral*, appraisals were set up and signed by myself qualifying the signed appraisal; that was deposited with the trust company together with the *collateral* and the appraisals usually were the appraisals which had been made at the time the mortgage was made."

At page 55: " the Treasurer's department knew what *collateral* was on hand and what certificates were outstanding."

The real gist of the transaction is obvious. The title company was in the business of placing and selling mortgages. It acquired a number of such mortgages which constituted the goods which it had for sale. It borrowed money from the general public for the financing of its business and deposited as security for such borrowings a portion of its stock in trade without in fact losing control over the portions so deposited, so far as its general business operations were concerned.

The question for determination is purely as to whether the placing of this infant's funds in this sort of a security is an investment in one or more bonds and mortgages or in shares or parts of one or more bonds and mortgages within the intendment of section 111 of the Decedent Estate Law. On the record the reply must obviously be in the negative.

On the demonstrated facts these certificates constituted merely a promise to pay, secured by a pledge of mortgage collateral over which the promisor had the absolute power of control. It seems strange to the court that it can seriously be contended that such a transaction constituted an investment " in shares or parts " of " bonds and mortgages."

As the Court of Appeals has pertinently remarked respecting such a transaction: " Certainly the holder acquires, prior to default, no rights in the mortgages, other or greater than the rights of a holder of collateral security   *   *   *   the guaranty company is a primary debtor, assigning the mortgages only as collateral security for the

debt." (*Matter of People* [*Tit. & Mtge. Guar. Co.*], 264 N. Y. 69, 88.)

In view of this authoritative declaration, which is, indeed, wholly applicable on the uncontroverted demonstration of the record, including the unconscious characterization of the nature of the transaction by the former officers of the title company themselves, it is apparent that in respect to these investments there was merely a pledge and not a mortgage. Whereas these two forms of security possess certain superficial resemblances their fundamental differences have been established in the law for generations. (*Gandy* v. *Collins*, 214 N. Y. 293, 298; *Hughes* v. *Harlam*, 166 id. 427, 432; *Susman* v. *Whyard*, 149 id. 127, 130; *Parshall* v. *Eggert*, 54 id. 18, 23, 24; *Fairchild* v. *Fairchild*, 5 Hun, 407, 414; affd., 64 N. Y. 471; *Wright* v. *Holbrook*, 18 Abb. Pr. 202, 206; affd., 32 N. Y. 587; *Breese* v. *Bange*, 2 E. D. Smith, 474, 486, 487; *Wilson* v. *Little*, 2 N. Y. 443, 446; *People* v. *Scudder*, 177 App. Div. 225, 228; affd., 221 N. Y. 671; *Brown* v. *Bement*, 8 Johns. 96, 98; *Campbell* v. *Parker*, 9 Bosw. 322, 328, 329.) It follows that this investment was merely in notes of the New York Title and Mortgage Company, and not in bonds and mortgages or in shares or parts thereof, and, therefore, not within the protection of section 85 of the Domestic Relations Law and section 111 of the Decedent Estate Law, and that the first objection of the special guardian must be sustained.

The second objection, as noted, is to the effect that the investment was "improvident and unwarranted." Whereas the court cannot, for the reasons stated, sustain this objection on the basis of the reason assigned by the special guardian, it deems it well founded on the fact demonstrated by the record that the sole security afforded was at the absolute mercy of the promisor. The trustee was its subsidiary, the values of the collateral securities were wholly fixed by its employees and such securities could be withdrawn at will and replaced by others, the determination of whose values was likewise solely within the power of the principal debtor. It was authorized to collect, satisfy and discharge all of the collateral obligations in its own name and " to decide when and how " (if at all) any collateral obligation should be enforced.

It has been firmly established in the law since the days of *King* v. *Talbot* (40 N. Y. 76, 88) that it is the duty of trustees to retain in their own hands the custody and management of the securities composing the corpus of the trust fund. Such security as existed in an investment of the variety here under consideration arose not by reason of the engagement of the promisor but solely as a result of the collateral which purported to secure it. According to the demonstrated facts, however, the impairment or even total destruc-

tion of this security lay at the complete mercy of the promisor itself. If the making of an investment of this type does not constitute improvidence on the part of a fiduciary, it would be difficult to conceive of an act within the connotation of the term.

The court is quite familiar with the decisions in *Matter of Alexander* (152 Misc. 354) and *Matter of Nix* (154 id. 61) wherein the propriety of such investments was sustained, but for the reasons hereinbefore detailed cannot concur in their results. Even were it demonstrated, which is not here the case, that fiduciaries limited to legally authorized investments have largely placed their funds in securities of this type, this could, in the opinion of the court, supply no sound reason for construing the pertinent existing statutes in a manner contrary to their obvious meaning and legal import. No one would have the temerity to assert that section 1044 of the Penal Law should be emasculated so as to exonerate a murderer, merely because deliberate homicide appears at times to be a prevalent pastime with certain portions of our population. No more could this court, in the present situation, justify its action in extenuating an act, expressly contrary to section 111 of the Decedent Estate Law, which has resulted in the loss of the birthright of this infant, merely because other misguided persons have been guilty of a like misfeasance.

Our system of government, whether wisely or otherwise, has divided its functions under three separate and distinct departments, and it is not the office of the judicial to encroach upon the legislative. If the law is wrong, it should be altered, but such alteration is beyond the accomplishment of a judicial officer and even less is it capable of repeal by the acts of isolated individuals by the mere process of ignoring its provisions.

Even were the anomalous position to be entertained that general failure to observe the dictates of a statute would constitute an estoppel against the court in its enforcement, no such practice has here been demonstrated. It is said that $27,574,576.37 in face value of certificates of this type have been issued, but there is no demonstration either in the record or in any other place with which the court is familiar which indicates that any appreciable proportion of these were purchased by fiduciaries who are limited to legally authorized investments. Perhaps the experience of the surrogate of the most populous county in the State is no criterion on the question, but the fact remains that this is the first instance of this nature which has ever come to the official attention of this court. The cases are numerous in which fiduciaries so limited have been found to have invested in common stocks, and if the argument of nullification of the statute by reason of disregard is valid, it would

seem to follow as a logical conclusion that the court has erred in imposing a surcharge for loss on fiduciaries for investments of such a nature.

The accountant appears to place great reliance upon an opinion of the Attorney-General of the State of New York dated September 26, 1928, in which that official expresses his belief that securities of the type here under consideration are legal investments for trust funds. Whereas this opinion appears to have been rendered to the Superintendent of Insurance at the latter's request, it has not been demonstrated that the question in any wise affected the official duties of the latter, since title companies are not included by the provisions of section 60 of the Insurance Law as among those whose certificates may be revoked by the Superintendent of Insurance for misrepresentation. Unless it was rendered for the purpose of guidance of the official acts of the Superintendent of Insurance, which has not been demonstrated, this opinion, while interesting as expressing the views of the individual who rendered it, has no legal significance whatsoever.

Even if it was rendered in the performance of his official duties, it is in no wise binding upon the court (*Matter of O'Connor* v. *Emerson*, 196 App. Div. 807, 810; affd., 232 N. Y. 561; *People* v. *Journal Co.*, 158 App. Div. 326, 333; affd., 213 N. Y. 1, 8; *Matter of Davison*, 137 Misc. 852, 856; affd., 236 App. Div. 684), particularly where, as in the present instance, it does not appear that it has ever been made the subject of official action.

It follows, therefore, that since these investments were not *in* bonds and mortgages or parts of the same within the express language of section 111 of the Decedent Estate Law, they were not legally authorized investments for the present accountant, wherefore a surcharge must be imposed for the loss which has resulted to the estate from this manner of dealing with its funds.

Enter decree on notice.