The bill is filed by beneficiaries of the residuary trust under the will of Robert R. Sinclair, deceased, against the trustees thereof, Peoples Bank and Trust Company and Lloyd Thompson. The purpose of the suit is to charge the trustees for alleged improper investments.
The defendants object that there is a lack of necessary parties. Testator's children, Shirley Sinclair Baird and Robert Rees Sinclair, are life tenants of the trust and the primary remaindermen are their surviving husband, wife and issue. In the event the longer-lived of the two, Shirley and Robert, is not survived by husband or wife or issue, the estate (or a half of it) goes "one-half thereof in equal shares to the then surviving next of kin of my late wife, Beatrice Sinclair, and the remaining half in equal shares to the next of kin of myself, then surviving and the trust shall be at an end." Mrs. Baird has a husband living and Mr. Sinclair a wife, but neither of them has children. In the contingency above stated, the next of kin of testator and his wife, living at the death of the life tenants, will take. The next of kin of the wife of testator are not parties to the bill, or to the counter-claim by which the trustees seek to settle their accounts. Complainants say they do not know who the next of kin are. Their mother, according to their information, was a Miss Hanan before her marriage; she was reared from childhood by a Mr. and Mrs. Crawford of Danbury, Conn.; she had two brothers, one of whom, at least, is dead. What were their Christian names, or whether they had children, complainants do not know. The defendants have no greater information.
The rule that all persons interested in a fund must be brought before the court, is subject to limitations "dictated by common sense upon grounds of necessity or even of convenience."Woolsey v. Woolsey, 78 N.J. Eq. 517, 525. If neither the life tenants nor the trustees are able to trace the *Page 563 
next of kin of testator's wife, and yet the court is unable to proceed in this cause without their joinder, then it would seem that the court is powerless to do equity for either the complainants or the defendants. But such is not the law; the court may dispose of the controversy by a decree which will be conclusive upon the parties before it. The objection to lack of parties must be overruled. Whether the decree will bind the late Mrs. Sinclair's next of kin, if at some future day they appear, will depend, I surmise, on the diligence with which the parties to the present cause have sought them.
The trustees invested $100,000 in mortgage participation certificates issued by the Plainfield Title and Mortgage Guaranty Company, evidencing an interest in a series or pool of mortgages. The complainants attack the investment on sundry grounds: Some of the mortgages in the pool, at the time the investment was made, exceeded 60 per cent. of the estimated worth of the real estate covered by such mortgages, and the trustees made no appraisal of the real estate. Some of the mortgages were not first liens but were subordinate to taxes in default when the trustees bought their certificates and the trustees made no examination of the title to ascertain whether the mortgages were first liens. The series in which the trustees invested was an open pool without limit as to amount and with the right reserved to the Guaranty Company, to substitute one mortgage for another.
The trustees rely upon "A supplement to an act entitled `An act concerning the investments of moneys and retention of investments in certain cases.'" P.L. 1920 p. 377, as amended, P.L. 1922 p.255; P.L. 1926 p. 506, and P.L. 1927 p. 144. The amendments of 1922 and 1927 are of little moment, but we must examine the 1920 act and 1926 amendment carefully.
The supplement of 1920 authorized fiduciaries to invest "in shares or parts of bonds secured by mortgage." The mortgage must be a first lien upon improved real estate and must not exceed 60 per cent. of the estimated worth of the real estate. The bond and mortgage, together with any guaranties of payment, insurance policies, and other instruments and evidence of title, shall be held for the benefit of the *Page 564 
investors by a trust company, bank or title guarantee company organized under the laws of this state. Such corporation shall issue to each investor a certificate setting forth that it holds the instruments above mentioned for the benefit of the investors.
This statute was taken, almost verbatim, from the New York Decedent's Estate Law as amended in 1918. Under color of authority of the New York act, trustees subject to the jurisdiction of that state, bought participations in single mortgages as well as in pools of mortgages. But in New Jersey, there was doubt whether the supplement of 1920 permitted investment in a series or group of mortgages. Or perhaps I should say that the prevailing opinion of counsel deemed our statute not to authorize such investments. Hence the amendment of 1926.
The 1926 amendment inserted a clause in the body of the supplement and added two long sentences at the end. It permitted investment "in participation certificates or coupon bonds which shall entitle the holder to a proportionate share in a series or number of mortgages and bonds or extensions or renewals thereof, deposited under a trust agreement with a trust company, bank or title guarantee corporation."
The requirements that the mortgages shall be first liens and not exceed 60 per centum of the estimated worth of the real estate, and that the corporation shall issue certificates to the investors, became applicable to investments in participations in a series or number of mortgages.
At the foot of the section, the legislature inserted authority to any trust company, title company or bank, incorporated under the laws of this state, to issue participation certificates or coupon bonds "secured by a trust mortgage or trust agreement deposited with a trust company, bank or title company, organized under the laws of this state, which trust mortgage or agreement may include a number of bonds and mortgages, and shall designate them as a series set apart as security for such participation certificates or coupon bonds, and refer to them by brief description of dates, parties, amounts, reference to location of property, maturity and rate of interest. Such trust agreement or mortgage shall contain suitable provisions *Page 565 
for substitution and extension of mortgages and bonds secured thereby, and it shall not be necessary to insert such details in the participation certificates or coupon bonds other than by reference to such trust mortgage or agreement."
While this part of the amendment in terms merely enlarges the powers of certain corporations, it should be construed to describe the certificates or bonds in which trustees were permitted to invest, although at least one seeming discrepancy between the two parts of the amendment may readily be noticed. The first part empowers trustees to buy certificates or bonds which "entitle the holder to a proportionate share" in the pool, while the second part of the amendment speaks of certificates or bonds "secured by a trust mortgage or trust agreement." The one suggests a transfer of title; the other, security for a debt.
Our legislature did not invent the certificate of participation in a pool of mortgages. By the amendment of 1926, it authorized trustees to invest in a type of security which had been well and favorably known for a number of years. The business of guaranteeing mortgages apparently had its origin in New York City at the beginning of the present century. About 1906, the participation certificate in individual mortgages and in pools or groups of mortgages was devised. I quote from the report of Commissioner George W. Alger to the Governor of New York October 5th, 1934: "The typical group series certificate purported to assign to the holder an undivided co-ordinate share of a specified amount in bonds or mortgages then or thereafter deposited with a depositary, together with a corresponding share in the interest of said sum. * * * Typical group series certificates reserved to the issuing company the power to withdraw any mortgages from the group and substitute others of an equal face amount." In 1926, when the legislature acted, the New York companies had outstanding a billion and a half dollars of guaranteed mortgages and participation certificates. While by far the greater part of the business was done in single mortgages and participation therein, group series issues had been growing rapidly for some years — almost all of them subject to substitutions. One of them, noted by Mr. Alger, included 848 *Page 566 
mortgages amounting to a total of about $10,000,000, when it went into default in 1933.
New Jersey has always been a part of the New York investment market, strongly affected by investment habits there. It seems to me clear that our legislature in 1926 intended to authorize New Jersey title companies to enter a field which was growing in popularity, the sale of participations in pools of mortgages of the same kind then fashionable in New York, and further, the legislature intended that trustees be permitted to invest in such certificates. We must not gauge the scope of the statute by the subsequent disastrous history of mortgage pools, but by the splendid record investments therein showed in 1926.
An investment in a series of mortgages is, in its nature, very different from investment in a share in a single mortgage. A share in a single mortgage is payable when the mortgage is payable. But a bond secured by, or a participation in, a number of mortgages must have an independent maturity date for it cannot be supposed that all the mortgages will fall due and be actually paid at the same time.
The nature of the business also requires, or makes very convenient, that the issuing company shall have power — hedged about by proper restrictions and subject, perhaps, to the approval of the depositary — to substitute one mortgage for another. Let us assume, while certificates are outstanding and before they are payable, a building on one of the mortgaged properties burns down and the insurance money is collected. Or a mortgage goes into default and is foreclosed and the property sold. Must the money so acquired be distributed pro rata in reduction of the outstanding certificates, or must it lie idle and not earn any return? I think not, for such a course would be contrary to uniform practice in 1926. The legislature intended that the issuing corporation could reinvest in good bond and mortgage, and place the new security in the pool for the benefit of the investors. Or if mortgaged property deteriorated in value so that the mortgage became unsafe, the issuing corporation ought to take the mortgage out of the pool and put in a better security. But the legislature did not limit mortgage substitutions to such *Page 567 
cases: it directed in general terms "suitable provisions for substitution."
Our statute is not clear. In effect, it directs that the issuing company shall execute to some other trust company, bank or title company, a trust mortgage or an agreement or declaration of trust that it holds for the security of the investors the bonds and mortgages making up the pool. In order to make known exactly what mortgages are security for the investors, such trust agreement shall list the mortgages by brief description. This would indicate that the mortgages must be in existence at the time the trust agreement is made and points to a closed pool. But the statutory purpose is accomplished if, from time to time, after the execution and delivery of the trust agreement, lists of mortgages are attached to the trust agreement or given to the depositary, so that there may be certainty at all times just what mortgages make up the pool. In my opinion, the questioned certificates were legal investments.
When a trustee invests in a part of a single mortgage, he may inspect the premises and satisfy himself as to their value. He may examine the title papers to satisfy himself that the mortgage is a first lien. But when he buys a participation in a number of mortgages, perhaps 100 or more, it is impractical for him to examine or to secure appraisals of all the properties and to search all the titles. Yet the legislature authorized him to make the investment. I think it must have been their intention that the trustee would be justified in relying on the representation of the corporation issuing the participation as to the value of the property and the state of the title.
A trustee is under no obligation himself to go to the court house to make a title search. He may rely upon the certificate of counsel or of a title company. Likewise, he may rely upon the appraisal of a competent expert. Ordinarily, of course, a trustee lending on mortgage, cannot depend on the assurance of the borrower as to the state of the title or the value of the security. But this is not quite the situation. The issuing company is more in the position of a middle man, guiding the flow of money from investors like our trustees, *Page 568 
to the borrowers, the makers of the mortgages. The Plainfield Title and Mortgage Guaranty Company was authorized by our statute to guarantee land titles. It was under the supervision of the Department of Banking and Insurance. Not only other trustees but cautious businessmen invested their funds in such certificates, relying on the statement of the issuing company that the mortgages were first liens and did not exceed a certain percentage of the land value.
The defendant trustees had the certificate of the Plainfield Title and Mortgage Guaranty Company that all the mortgages in the pool were first liens, and that no loan secured by such a mortgage "does exceed or will in future exceed 60 per centum of the estimated worth of the real estate." The trustees were justified in relying upon these representations. Ross v.Savings, c., Co., 120 N.J. Eq. 87.
Complainants rely on Gates v. Plainfield Trust Co., 121 N.J. Eq. 460
(at p. 470) where a very able judge, Vice-Chancellor Egan, surcharged a trustee for investing in the very series of certificates which are involved in the present case, and which are described fully in his opinion. He put his decision on alternate grounds, first that the investment was not authorized by the statute and second that the trustee was interested in the issuing company to such an extent that the investment was improper. The decree was affirmed by a per curiam which does not show whether or not the Court of Errors and Appeals passed on the legality of the investment. 122 N.J. Eq. 366. On this branch of the case, Vice-Chancellor Egan leaned strongly on Inre Stupack's Estate, 278 N.Y.S. 403. That decision was thereafter reversed in 274 N.Y. 198; 8 N.E. Rep. 2d 485;110 A.L.R. 1158. A quotation from Judge Lehman in the Court of Appeals states the legal issue:
"Our problem is whether the legislature, by the language used in describing lawful investments of trust funds, intended to include in that description investment in mortgage certificates like those in which, as shown upon the accounting in this case, the infant's estate has been invested; and whether a fiduciary reading the statute with reasonable care would so understand. For that purpose we must read the language *Page 569 
of the statute in the light of its history and of the conditions prevailing when the statute was adopted."
After much hesitation and with great reluctance, I find myself unable to follow in toto the opinion in Gates v. PlainfieldTrust Co. The decree in that cause is fully supported by the second or alternate ground given in the opinion without regard to the legality of mortgage participations as trust investments.
The trustees' purchase of certificates of several other companies is attacked on the same grounds as the certificates of the Plainfield Title and Mortgage Guaranty Company and is justified for the reasons above stated.
The remaining branch of the case arises from the investment by the trustees of $269,000 in guaranteed mortgages and certificates of the Bankers Title and Mortgage Guaranty Company. The investment has been reduced to around $150,000. Some $15,000 of these are certificates known as Series C. The trust agreement securing these certificates, between the Bankers company and the Westfield Trust Company, as trustee or depositary, provided for an open pool: that is, Bankers was free to deposit additional mortgages and issue additional certificates, and it reserved the right to withdraw mortgages from the pool and deposit other mortgages instead. Nowhere in the agreement is there a representation or stipulation that the mortgages in the pool and to be added or substituted, are and would be liens on improved real estate, not exceeding 60 per cent. of the value of the real estate. The certificates which issued pursuant to the agreement and which the defendant trustees purchased, are likewise silent on the nature and value of the underlying security. Now let us assume that when the trustees made this investment, all the mortgages in the pool met the statutory requirements. Still it was within the option of the issuing company, before the certificates were payable, to dilute the security with mortgages on vacant land up to 80 or 90 per cent. of the estimated worth of the same. Clearly, these certificates were not legal investments.
The investment in these certificates and in other series of the Bankers company is further questioned because of the *Page 570 
relations between the defendant trustees and the issuing company. The latter company was organized in 1926 by four groups, one being men prominent in defendant Peoples Bank and Trust Company, the remaining three groups being active in three other neighboring banks. There was $200,000 par value of Bankers capital stock issued, of which an average $65,000 was held, during the period the mortgages and certificates were purchased, by nine, out of nineteen directors of the defendant Peoples Bank. The Bankers' board of directors had sixteen members, one-quarter of whom were also directors of Peoples. The defendant Thompson was not financially interested in his co-trustee, the Peoples Bank. He held about $15,000 par value of the stock of the Bankers company and, until May, 1929, was its president. Thereafter, he remained a director.
The rule that a trustee must not deal with himself needs no citation of authority. But when we come to transactions between a corporate trustee and an affiliated corporation, or between an individual trustee and a company in which he has an interest, the application of the rule is not always easy.
The Trust Restatement § 170, h and i, correctly states that the duty of loyalty forbids a trustee to buy for the trust, property of a corporation in which he has a controlling or substantial interest, and forbids a corporate trustee to buy from an affiliated corporation in which it has such a substantial interest "that there would be a temptation to consider its own advantage." "The rule is the same where the shares of the selling corporation are owned by the shareholders of the corporate trustee."
This principle has been applied by our courts in several cases. In Shanley v. Fidelity Union Trust Co., 108 N.J. Eq. 564,
Vice-Chancellor Backes enjoined a corporate trustee from selling trust assets to another corporation where there were "half a dozen or more" common directors. In Gates v. Plainfield TrustCo., supra, the trustee corporation, because it owned the majority stock of a company from which it bought mortgages for the trust, was charged with the amount it paid for the securities, although its good faith in making the investments was not questioned. Our most recent case *Page 571 
is Rothenberg v. Franklin Washington Trust Co., 127 N.J. Eq. 406; 129 N.J. Eq. 361, and 131 N.J. Eq. 463. The trustee had twenty-four directors; its affiliated mortgage company, thirteen; there were six common directors. The same gentlemen were chairmen of the board and vice-presidents of both companies. The trustee was required to relieve the estate of investments it had purchased from its affiliate. Vice-Chancellor Fielder said:
"When the Trust Company undertook administration of this trust it became bound by an inflexible rule of law applicable in every case, that one having a trust relation or obligation toward another shall not place himself in a situation in which he might be tempted to take advantage of his cestui que trust, and for any act in violation of the rule, no matter how pure his intention, such act is voidable at the instance of the person he represents. This rule was adopted long ago by our Court of Errors and Appeals. Staats v. Bergen, 17 N.J. Eq. 554. * * * Thus when directors of the Trust Co. voted to invest the money of this trust in securities taken over from the Mortgage Co., they had dual interests to consider and serve and, as all the cases point out, a trustee cannot serve two masters whose interests may be in conflict and the complainants have an absolute right to disavow such investments (citing cases), unless by their subsequent actions or conduct they can be said to have concurred or acquiesced in the investments. It matters not that those Trust Co. directors who were officers and directors of the Mortgage Co. did not vote at the board meeting at which investment of the trust funds was considered and authorized. They were present at the meeting and it was their duty, as it was the duty of every member of the board, to find a proper and advantageous investment of the funds entrusted to their care and they could not shirk that duty or acquire any advantage to themselves by declining to vote."
Mr. Thompson and nine directors of the Peoples Bank, had a very substantial interest in the Bankers Mortgage and Title Guaranty Co. The prosperity of the latter and the value of its shares of stock depended on its ability to sell mortgage securities. Our trustees were unable to appraise *Page 572 
those securities with an impartial mind, for if they should have decided that the offerings of Bankers were not safe investments, they would have ruined that company. It is a fact, as indicated by the proofs, that the mortgages and certificates sold by Bankers were good investments and it is also a fact that the trustees acted with the best of faith. But that does not affect the result. The rule here involved is one of important public policy which gives to the beneficiaries of the trust the right to disavow these investments.
The defendants urge acquiescence and laches. One of the life tenants, Robert R. Sinclair, living in Florida, employed counsel in 1931. His counsel made inquiries which elicited considerable information, especially in Mr. Thompson's letter of June 29th, 1931, but not enough to put Mr. Sinclair on notice of the relations between the trustees and the Bankers company. It does not appear that the other life tenant, Mrs. Baird, or any of the remaindermen, had any knowledge whatever of these relations or of the legal deficiencies of the Series "C" certificates, until shortly before this litigation was begun in the fall of 1935. The defense cannot be sustained.